ANN WALSH BRADLEY, J.
¶ 1. This is a review of an unpublished opinion of the court of appeals, which reversed the circuit court's judgment awarding damages in favor of Amjad Tufail (Tufail). The case before us involves a contract dispute between the landlord, Tufail, and the tenant, Midwest Hospitality, LLC (Midwest Hospitality) over the terms of a commercial lease of property.[1]
¶ 2. Tufail, the petitioner, asserts that the court of appeals erred when it determined that Midwest Hospitality's early termination of the lease was justified *635 by Tufail's misrepresentation. Although he acknowledges that the lease unambiguously provides a representation that Midwest Hospitality may not be prevented from using the property for certain specified purposes, Tufail argues that operation of a fast-food restaurant with a drive-through is not among the purposes listed in the lease. He further asserts that all of the uses identified in the lease are permitted uses of the premises under the City of Milwaukee zoning code.
¶ 3. Additionally, Tufail contends that the representation was not false given that the City of Milwaukee granted a special use permit allowing the operation of a Church's Chicken restaurant, including the operation of a Church's Chicken fast-food restaurant with a drive-through.
¶ 4. We conclude that the representation does not include any use of the property as a Church's Chicken fast-food restaurant with a drive-through. Additionally, there is no indication that any of the uses identified in the lease were prevented under the City of Milwaukee zoning code.
¶ 5. We further conclude that the representation was not false because the circuit court found that Midwest Hospitality was not prevented from using the property for the uses specified in the lease, and its finding is not clearly erroneous. Therefore, Tufail did not breach the lease. Accordingly, we reverse the court of appeals and remand, and the judgment of the circuit court is thereby affirmed.
I
¶ 6. The contract dispute in this case concerns the terms of a commercial lease for a property located on West North Avenue in Milwaukee, Wisconsin. Tufail *636 had previously operated a restaurant called "New York Chicken" on the property before leasing the property to Midwest Hospitality.[2]
¶ 7. After purchasing the property in 2000, Tufail submitted a request to the City of Milwaukee Development Center for a permit to operate a fast-food restaurant. His application was denied, but Tufail appealed to the City of Milwaukee Board of Zoning Appeals. On November 9, 2000, the Board of Zoning Appeals granted Tufail's request for a permit to operate a fast-food restaurant for a ten-year period. Under the terms of the permit, the New York Chicken restaurant was allowed to remain open until 4:00 a.m.
¶ 8. Sometime before the New York Chicken restaurant ceased operations in 2007 and again after operations ceased, Midwest Hospitality approached Tu-fail and inquired about opening a Church's Chicken restaurant on the property. Prior to negotiating the lease, Midwest Hospitality visited the former New York Chicken restaurant and conducted a walk-through of the property. It then prepared a written lease and the parties negotiated its terms.
¶ 9. Tufail and Midwest Hospitality formally executed the lease in March 2008. It was to be in effect for a five-year period beginning on April 1, 2008 and ending on March 31, 2013. Midwest Hospitality agreed to pay rent in the amount of $35,000 for the first year, which was to be paid in equal installments on a monthly basis.
¶ 10. Paragraph 5 of the lease specified the intended purposes for which the property may be used:
*637 5. Use of Premises. Tenant may use and occupy the Premises for any lawful purposes, including, but not limited to, the retail sales, consumption, and delivery of food and beverages which shall include, but not be limited to, Chicken products, Fish products, bread products, salads, sandwiches, dessert items, promotional items, and any other items sold by any Church's Chicken store.
Tufail also made representations in Paragraph 33 of the lease, which provide as follows, in relevant part:
Landlord represents and warrants to Tenant that:
(g) no existing restrictions, building and zoning ordinances, or other laws or requirements of any governmental authority prevent the use of the Premises for the purposes set forth in Paragraph 5 ... .
Landlord hereby acknowledges that Tenant is relying upon all of the foregoing representations and warranties in executing this Lease and that matters so represented and warranted are material ones, and Landlord accordingly agrees that any misrepresentation or breach of such warranty will be reason for Tenant to terminate this Lease.
Furthermore, the lease contained an integration clause providing that the written lease set forth all understandings between Tufail and Midwest Hospitality:
This Lease, the exhibits, rider and addendum, if any, attached hereto and forming a part hereof set forth all the covenants, promises, agreements, conditions, terms, provisions and understandings by and between the Landlord and Tenant concerning the Premises. There are no other such matters, whether oral or written, between Landlord and Tenant other than are set forth herein. No change, modification, alteration, amendment, addition or deletion to this Lease shall be *638 binding upon Landlord or Tenant unless it is in writing and executed by the person to be so charged with the same. Landlord and Tenant have negotiated the terms of this Lease; therefore, this Lease shall not be interpreted or construed against or in favor of any party.
¶ 11. After the lease was executed, Midwest Hospitality entered the property and began renovation. It completed some initial preparation work, but did not ultimately complete the renovations.
¶ 12. The renovation work ended in May 2008 when Midwest Hospitality was informed that it needed to obtain a special use permit in order to operate a fast-food restaurant with a drive-through at the property. A special use permit is a particular type of permit required by the City of Milwaukee in order to use a property for certain purposes under the zoning code. Although a sit-down restaurant[3] is classified as a "Permitted Use," a fast-food restaurant[4] is classified as a "Limited Use" requiring a special use permit.
¶ 13. Upon being advised of the permit requirement, Midwest Hospitality applied for a special use permit to operate a Church's Chicken fast-food restaurant with a drive-through on the property. The application was met with opposition by community groups that *639 opposed adding a Church's Chicken restaurant to the neighborhood.[5]
¶ 14. Despite the opposition, the City of Milwaukee Board of Zoning Appeals ultimately approved Midwest Hospitality's application for a special use permit in a written decision issued on September 22, 2008. The special use permit was issued subject to certain conditions, which are set forth in relevant part as follows:
10. That this use, both fast-food/carry-out and drive-through, closes by 9:00 p.m.
11. That this Special Use is granted for a period of one (1) year, commencing with the date hereof.
At trial, a Midwest Hospitality representative testified that the conditions in the special use permit changed the business's profitability forecast and rendered the operation of a Church's Chicken restaurant on the property not worth the investment:
Q. And now could you have run the Church's Chicken at 1635 West North with restrictions on the evening hours to 9:00 p.m. and a new review by [the Board of Zoning Appeals] every year?
A. No way. It would just be impossible. It wouldn't even be worth the investment.. . . [The 9:00 closing restriction] changed our forecast that we had in mind for the profitability of this business ....
¶ 15. After the special use permit was approved, Midwest Hospitality notified Tufail that it would stop paying rent. It sent a letter to Tufail arguing that it was not responsible for the lease payments because a special use permit was required to operate a Church's Chicken *640 fast-food restaurant with a drive-through. It therefore contended that Tufail made a false representation and that it was entitled to terminate the lease before the five-year term expired.
¶ 16. Tufail, in turn, commenced the present action. He alleged a breach of contract claim, an anticipatory breach of contract claim, and a claim for breach of the duty of good faith and fair dealing. Midwest Hospitality later pled counterclaims alleging a breach of contract, deceptive advertising contrary to Wis. Stat. § 100.18 (2009-10), and unjust enrichment.
¶ 17. The circuit court presided over a three-day bench trial, which took place in March 2011. At the conclusion of the trial, the circuit court made findings of fact relating to the claims advanced in the pleadings. It found that the "vast majority of Church's Chicken restaurants have drive-through operations, but not all." Additionally, "Midwest Hospitality's application for a special use permit to use the subject property for a fast-food restaurant with a drive-through was approved by the City of Milwaukee," and it was not "prevented], in any way, [] from opening a Church's Chicken restaurant at the subject property with a drive-through and as a fast food restaurant."[6]
¶ 18. Turning to examine the text of the lease, the circuit court determined that it unambiguously failed to set forth any use as a fast-food restaurant with a drive-through. It concluded that "Midwest Hospitality was able to use the subject property for its intended use as set forth in the lease." Furthermore, it determined that "even if the subject lease was interpreted to include as an intended use a fast food restaurant with a drive-through, that intended use was allowed by the *641 City of Milwaukee." Ultimately, there was "no evidence presented that [Tufail's] representations and warranties were not true."
¶ 19. Because Tufail did not breach the lease, the circuit court concluded that Midwest Hospitality's early termination of the lease was itself a breach of contract. It proceeded to enter a judgment awarding Tufail $90,033.21 in damages.
¶ 20. Midwest Hospitality appealed and the court of appeals reversed the circuit court. Tufail v. Midwest Hospitality, LLC, No. 2011AP1451, unpublished slip op. (Ct. App. Aug. 1, 2012). It concluded that the "early termination of the lease was justified by Tufail's misrepresentation," stating that Tufail's representation that "no zoning laws restricting [Midwest Hospitality's] operation of a Church's Chicken fast-food restaurant on the leased premises" was "false from the moment the parties signed the lease." Id., ¶¶ 1, 9.
¶ 21. The court of appeals rejected Tufail's argument that he did not make a false representation because the lease does not set forth a use as a fast-food restaurant with a drive-through. Id., ¶ 8. It concluded that by reference to "Church's Chicken," Paragraph 5 of the lease "allowed the operation as a Church's Chicken" and that it was "not necessary for the use provision in the lease to include additional words allowing operation of a fast-food restaurant. A Church's Chicken is a fast-food restaurant." Id.
II
¶ 22. This case requires us to determine whether Tufail breached the lease, a written contract, by making a false representation. The interpretation of a contract *642 presents a question of law, which we determine independently of the conclusions rendered by the circuit court and the court of appeals. Ehlinger v. Hauser, 2010 WI 54, ¶ 47, 325 Wis. 2d 287, ¶ 47, 785 N.W.2d 328.
¶ 23. Here, the circuit court presided over a three-day bench trial and made findings of fact. We accept the circuit court's findings of fact unless they are clearly erroneous. Phelps v. Physicians Ins. Co. of Wisconsin, Inc., 2009 WI 74, ¶ 34, 319 Wis. 2d 1, 768 N.W.2d 615.
Ill
¶ 24. The sole question presented on review is whether Tufail breached the lease by making a false representation. The lease is a written contract and our analysis is controlled entirely by well-established canons of contract interpretation. Accordingly, as a preface to addressing the question presented, it is helpful to review those basic principles of contract interpretation relevant to the issue before us.
¶ 25. Contract interpretation generally seeks to give effect to the parties' intentions. Seitzinger v. Community Health Network, 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 676 N.W.2d 426. However, "subjective intent is not the be-all and end-all." Kernz v. J.L. French Corp., 2003 WI App 140, ¶ 9, 266 Wis. 2d 124, 667 N.W.2d 751. Rather, "unambiguous contract language controls contract interpretation." Id.
¶ 26. Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms. Maryland Arms Ltd. Partnership v. *643 Connell, 2010 WI 64, ¶ 23, 326 Wis. 2d 300, 786 N.W.2d 15 (quoting Gorton v. Hostak, Henzl & Bichler, S.C., 217 Wis. 2d 493, 506, 577 N.W.2d 617 (1998)). "We presume the parties' intent is evidenced by the words they chose, if those words are unambiguous." Kernz, 266 Wis. 2d 124, ¶ 9.
¶ 27. If the terms of the contract are ambiguous, evidence extrinsic to the contract itself may be used to determine the parties' intent. Seitzinger, 270 Wis. 2d 1, ¶ 22. "A contract provision is ambiguous if it is fairly susceptible of more than one construction." Mgm't Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996).
¶ 28. Contract language is construed according to its plain or ordinary meaning, Huml v. Vlazny, 2006 WI 87, ¶ 52, 293 Wis. 2d 169, 716 N.W.2d 807, consistent with "what a reasonable person would understand the words to mean under the circumstances." Seitzinger, 270 Wis. 2d 1, ¶ 22. For a business contract, that is "the manner that it would be understood by persons in the business to which the contract relates." Columbia Propane, L.P. v. Wisconsin Gas Co., 2003 WI 38, ¶ 12, 261 Wis. 2d 70, 661 N.W.2d 776.
¶ 29. The court construes contracts "as they are written." Id., ¶ 12. Ultimately, "the office of judicial construction is not to make contracts ... but to determine what the parties contracted to do." Marion v. Orson's Camera Centers, Inc., 29 Wis. 2d 339, 345, 138 N.W.2d 733 (1966) (quoting Wisconsin Marine & Fire Ins. Co. Bank v. Wilkin, 95 Wis. 111, 115, 69 N.W. 354 (1897)).
*644 ¶ 30. Additionally, as this court recently stated, courts may not consider evidence of prior or contemporaneous oral or written agreements between the parties if a contract is fully integrated:
A contract that represents the final and complete expression of the parties' agreement is considered fully "integrated." If the contract is integrated, absent the existence of fraud, duress, or mutual mistake, the court construing the contract may not consider evidence of any prior or contemporaneous oral or written agreement between the parties.
Town Bank v. City Real Estate Development, LLC, 2010 WI 134, ¶ 37, 330 Wis. 2d 340, 793 N.W.2d 476. If a contract contains "an unambiguous merger or integration clause, the court is barred from considering evidence of any prior or contemporaneous understandings or agreements between the parties, even as to the issue of integration." Id., ¶ 39; Peterson v. Cornerstone Property Development, LLC, 2006 WI App 132, ¶ 31, 294 Wis. 2d 800, 720 N.W.2d 716 (quoting Ziegler Co. v. Rexnord, Inc., 139 Wis. 2d 593, 608-09 n.11, 407 N.W.2d 873 (1987)) (courts may not consider extrinsic evidence to "vary or contradict the terms of a writing" when the contract is fully integrated).
¶ 31. In this case, as quoted above, the lease at issue contains an integration clause. It states that the entire agreement between the parties has been reduced to writing. It plainly states without qualification that "all" of the understandings between the parties are set forth in the lease and any attached exhibits, riders, or addendums. Therefore, we are guided by the text of the lease, not by any extrinsic, unwritten understandings *645 that may have existed between the parties.[7] Id.; Peterson, 294 Wis. 2d 800, ¶ 31 (quoting Ziegler Co., 139 Wis. 2d at 608-09 n.11).
¶ 32. Having reviewed the relevant canons of contract interpretation, we turn now to address the question of whether Tufail breached the lease by making a false representation. Our inquiry hinges first on the meaning of Tufail's representation as it is written in the lease, and second, on whether the representation is false under the facts of this case. The representation states as follows:
Landlord represents and warrants to Tenant that:
(g) no existing restrictions, building and zoning ordinances, or other laws or requirements of any governmental authority prevent the use of the Premises for the purposes set forth in Paragraph 5 ... .
*646 Paragraph 5 of the lease, in turn, provides that:
5. Use of Premises. Tenant may use and occupy the Premises for any lawful purpose, including, but not limited to, the retail sales, consumption, and delivery of food and beverages which shall include, but not be limited to, Chicken products, Fish products, bread products, salads, sandwiches, dessert items, promotional items, and any other items sold by any Church's Chicken store.
¶ 33. Tufail acknowledges that the lease unambiguously provides that Midwest Hospitality may not be prevented from using the property for certain specified purposes. He advances, however, that a fast-food restaurant with a drive-through is not among the "purposes set forth in Paragraph 5." Furthermore, he asserts that all of the uses identified in Paragraph 5 are permitted uses of the premises under the City of Milwaukee zoning code. Given that the City of Milwaukee granted a special use permit allowing the operation of a Church's Chicken restaurant, including the operation of a Church's Chicken fast-food restaurant with a drive-through, he contends that the representation was not false.
¶ 34. Midwest Hospitality likewise acknowledges the unambiguous text of the lease, but further argues that the lease incorporates the fact that "Church's Chicken was understood to be a fast-food restaurant by all parties."[8]
*647 ¶ 35. We construe the contract as it is clearly written. Midwest Hospitality may not be prevented from using the property for the purposes specifically identified in Paragraph 5. Paragraph 5 then identifies the various products which may be consumed, sold, distributed, or otherwise used on the property.
¶ 36. Among the products identified in Paragraph 5 is counted "any other items sold by any Church's Chicken store." Midwest Hospitality argues, and the court of appeals concluded, that the reference to a "Church's Chicken" in Paragraph 5 requires that a Church's Chicken fast-food restaurant with a drive-through may be operated on the property. We reject that argument.
¶ 37. A mere reference to products used by a "Church's Chicken store" does not represent that Midwest Hospitality may operate a Church's Chicken fast-food restaurant with a drive-through. The lease plainly provides that Midwest Hospitality may not be prevented from using the property for certain, specified purposes. Notably absent from that list is any requirement that the property may be used as a fast-food restaurant with a drive-through.[9]
*648 ¶ 38. Accordingly, we conclude that Tufail's representation requires simply that Midwest Hospitality may not be prevented from using the property for the purposes specifically identified in Paragraph 5. Having ascertained the plain meaning of the representation, all that remains is to determine whether the representation is false under these facts.
¶ 39. In this case, the circuit court made extensive findings of fact at the conclusion of a three-day bench trial. It found that "[t]he vast majority of Church's Chicken restaurants have drive-through operations, but not all." There was "no evidence" showing that Tufail knew about the many other Church's Chicken restaurants, whether or not they had drive-through operations, or about Church's Chicken franchise requirements such as closing times.
¶ 40. The circuit court also found that the parties "entered into a written lease in March of 2008," which was, by its own terms, to last for a five-year period. After the lease was signed and Midwest Hospitality *649 took occupancy, it discovered that a special use permit was required from the City of Milwaukee "so that it could have a drive-through as part of the restaurant."
¶ 41. Furthermore, the circuit court found that "Midwest Hospitality's application for a special use permit to use the subject property for a fast food restaurant with a drive-through was approved by the City of Milwaukee." Although it observed that the approval "was not exactly as Midwest Hospitality may have wanted" due to the conditions in the special use permit, it found that Midwest Hospitality was not prevented, "in any way, [] from opening a Church's Chicken restaurant at the subject property." The special use permit allowed operation "with a drive-through and as a fast food restaurant":
But the special use permit as approved by the City of Milwaukee did not prevent, in any way, Midwest Hospitality from opening a Church's Chicken restaurant at the subject property with a drive-through and as a fast food restaurant. Therefore, the Court finds that even if the subject lease was interpreted to include as an intended use a fast food restaurant with a drive-through, that intended use was allowed by the City of Milwaukee. The representations and warranties of Mr. Tufail contained in the lease itself are for the intended use as specifically set forth in the lease in paragraph five, and there was no evidence presented that those representations and warranties were not true.
Accordingly, the circuit court determined that "the claim that Mr. Tufail made misrepresentations was not established."
¶ 42. No one argues that the findings of the circuit court, to the extent that they set forth the dispositive facts of this case, are clearly erroneous. Phelps, 319 Wis. 2d 1, ¶ 34. We likewise see no indica *650 tion that its findings are clearly erroneous. Therefore, we are bound to accept those findings, including the circuit court's finding that Midwest Hospitality was not in fact prevented from opening a Church's Chicken restaurant at the subject property.
¶ 43. Given the lack of any reference in the lease to a fast-food restaurant with a drive-through, there is no indication in the facts that the uses of the property, as they are stated in Paragraph 5 of the lease, were prevented. There is no indication that any of the uses specified in Paragraph 5 cannot be performed at a sit-down restaurant, which is a permitted use under the City of Milwaukee zoning code. Rather, the fact that Midwest Hospitality was granted a special use permit specifically allowing use of the property as a Church's Chicken restaurant soundly refutes the premise that Midwest Hospitality was prevented from using the property for any of the purposes stated in Paragraph 5.
¶ 44. We further observe that even if we accepted Midwest Hospitality's argument that there is an "undisputed understanding of Church's Chicken" as a fast-food restaurant with a drive-through and that the representation incorporates that "undisputed understanding," the representation is still not false under these facts. The circuit court expressly found that when the special use permit was granted by the City of Milwaukee, Midwest Hospitality was allowed to operate a Church's Chicken fast-food restaurant with a drive-through.
¶ 45. The facts of this case indicate that although Midwest Hospitality was not prevented from using the property for the purposes identified in Paragraph 5 of the lease, those purposes alone did not necessarily ensure that the proposed Church's Chicken restaurant was worth Midwest Hospitality's investment. However, *651 as the circuit court observed, "[t]here was nothing to prevent Midwest Hospitality from putting contingencies in the lease about hours of operation, a drive-through or anything else deemed necessary. It did not." We interpret only the contract to which the parties agreed. Marion, 29 Wis. 2d at 345.
¶ 46. Ultimately, the result of this case is compelled by basic principles of contract interpretation and by the circuit court's findings of fact following a three-day bench trial. Tufail explicitly represented in paragraph 33 of the lease that Midwest Hospitality would not be prevented from using the property for the listed purposes.
¶ 47. The circuit court found that there was no evidence to support the argument that the representations were untrue. Additionally, it found that Midwest Hospitality was not prevented "in any way" from opening a Church's Chicken restaurant at the leased property.
• "The representations and warranties of Mr. Tufail contained in the lease itself are for the intended use as specifically set forth in the lease in paragraph five, and there was no evidence presented that those representations and warranties were not true."
• "[T]he special use permit as approved by the City of Milwaukee did not prevent, in any way, Midwest Hospitality from opening a Church's Chicken restaurant at the subject property with a drive-through and as a fast food restaurant."
¶ 48. Importantly, the circuit court specifically found that even if the lease was interpreted to include uses not explicitly listed in its terms — uses as a fast-food restaurant with a drive-through — that the evidence showed that such uses were not prevented.
*652 • "Therefore, the Court finds that even if the subject lease was interpreted to include as an intended use a fast food restaurant with a drive-through, that intended use was allowed by the City of Milwaukee."
¶ 49. There has been no showing that the circuit court's dispositive findings of fact are clearly erroneous. No party has even attempted to advance such an argument. Accordingly, we conclude that Tufail did not breach the lease by making a false representation.
IV
¶ 50. In sum, we conclude that the representation does not include any use of the property as a Church's Chicken fast-food restaurant with a drive-through. Additionally, there is no indication that any of the uses identified in the lease were prevented under the City of Milwaukee zoning code.
¶ 51. We further conclude that the representation was not false because the circuit court found that Midwest Hospitality was not prevented from using the property for the uses specified in the lease, and its finding is not clearly erroneous. Therefore, Tufail did not breach the lease. Accordingly, we reverse the court of appeals and remand, and the judgment of the circuit court is thereby affirmed.
By the Court. — The decision of the court of appeals is reversed and remanded. The judgment of the circuit court is thereby affirmed.

 Tufail v. Midwest Hospitality, LLC, No. 2011AP1451, unpublished slip op. (Ct. App. Aug. 1, 2012), reversing the circuit court, William S. Pocan, J., presiding.

 Tufail described the New York Chicken restaurant as "a chicken place" that was similar in nature to a Church's Chicken restaurant but with a different name.

 A "sit-down restaurant" is defined in the zoning code as "a restaurant where the food or beverages sold are consumed at tables located on the premises, where taking food or beverages from the premises is purely incidental, where food or beverages are normally served utilizing nondisposable containers and utensils and where the consumption of food or beverages in vehicles on the premises in which the building is located does not regularly occur ...."

 A "restaurant, fast-food/carryout" is defined in the zoning code as "a restaurant other than a sit-down restaurant where the manner of preparation, packaging and serving of food or beverages encourages their consumption outside the building."

 Midwest Hospitality in its brief describes those individuals or groups opposing its application as "neighbors, physicians, Walnut Way Conservation Corporation (a local neighborhood association) and even a Wisconsin State Representative."

 Additional discussion of the circuit court's findings of fact may be found at ¶¶ 39-41, infra.

 Contrary to the unambiguous integration clause, Midwest Hospitality urges us to consider the parties' unwritten "understanding of Church's Chicken" as a fast-food restaurant. It contends that "Church's Chicken was understood to be a fast-food restaurant by all parties," and that understanding is "inherent in interpreting [the lease's references to] 'Church's Chicken'. . . regardless of the absence of 'fast-food' in the Use of Premises provision." In effect, it contends that "there is no such thing" as a sit-down Church's Chicken restaurant.
Here, however, the parties have expressly stated that "[t]his Lease . .. set[s] forth all the ... understandings by and between the Landlord and Tenant concerning the Premises." In light of the parties' unambiguous statement that no additional understandings existed between them concerning the lease, we decline to consider Midwest Hospitality's "understanding of Church's Chicken" as a particular type of fast-food restaurant when such an understanding is not presented in the text of the lease.

 Tufail states in his brief that "[t]he lease is unambiguous," while Midwest Hospitality argues that Tufail "unambiguously warrantied that there were no zoning restrictions preventing... the contemplated use of the Property." Their respective "unambiguous" constructions of the lease diverge greatly in scope.
That the parties have construed the representation differently does not alone render it ambiguous. Ambiguity is found *647 where a contract "is fairly susceptible of more than one construction," not necessarily where different constructions are argued. Mgm't Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co., 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996). We must interpret the lease "as it stands, even though the parties may have placed a different construction on it." Cernohorsky v. Northern Liquid Gas Co., 268 Wis. 586, 593, 68 N.W.2d 429 (1955); see also Brew City Redevelopment Group, LLC v. The Ferchill Group, 2006 WI App 39, ¶ 3, 289 Wis. 2d 795, 714 N.W.2d 582.

 Likewise, the lease does not set forth any requirements regarding the conditions specified in the special use permit relating to the hours of operation or the time period in which *648 any permit must be renewed. Despite the lack of reference to a fast-food restaurant or to the conditions set forth in the special use permit, the dissent interprets the lease to mean that Tufail "warrant[ied] that there were no zoning requirements with which Midwest had to comply in order to sell Church's Chicken products in a fast-food restaurant." Dissent, ¶ 78; see also dissent, ¶¶ 94, 101.
In relying on words that cannot be found in the lease, the dissent appears to rewrite it. The representation in the lease simply states that no existing restrictions, building and zoning ordinances, or other laws or requirements prevent Midwest Hospitality from using the property for the purposes identified in Paragraph 5. It focuses on whether Midwest Hospitality is prevented from using the property for certain purposes, not on whether Midwest Hospitality had to comply with various governmental regulations.