ANN WALSH BRADLEY, J. (dissenting).
*784 ¶ 74 The restrictive covenant at issue provides, "There shall be no commercial activity allowed on any of said lots." Although the application of the phrase "commercial activity" in some contexts may render the statute ambiguous, it is not ambiguous here.
¶ 75 The Neuschwanders purchased the property in 2014, renovated it, and have primarily rented it out to vacationers. Lead op., ¶ 6. In 2015, the Neuschwanders received $55,784.93 in rent including taxes and paid $4,973.81 in room tax to the City of Hayward.
¶ 76 To run such a lucrative enterprise is, in my view, plainly "commercial activity." It relates to commerce and has profit as its chief aim. Accordingly, I reach a conclusion contrary to the lead opinion[1] and respectfully dissent.
*785 *657 I
¶ 77 The lead opinion concludes that the term "commercial activity" as used in the restrictive covenant is ambiguous. Lead op., ¶¶ 21-22. It therefore construes the words in favor of the property owners' ability to use their property freely. Id., ¶ 26. Accordingly, in the lead opinion's view, the restrictive covenant does not prohibit any short-term or long-term rentals of the Neuschwanders' property. Id., ¶ 28.
¶ 78 A restrictive covenant will be enforced if the intention of the parties is clearly shown in the covenant. Voyager Vill. Prop. Owners Ass'n v. Johnson, 97 Wis. 2d 747, 749, 295 N.W.2d 14 (Ct. App. 1980). Intent does not refer to the subjective intent of the drafter, but to the scope and purpose of the covenant as manifest by the language used. Zinda v. Krause, 191 Wis. 2d 154, 166, 528 N.W.2d 55 (Ct. App. 1995).
¶ 79 Further construction of a covenant is only necessary when it is ambiguous. Voyager Village, 97 Wis. 2d at 749, 295 N.W.2d 14. In interpreting the language of a restrictive covenant, we apply the plain and ordinary meaning of the words. See Tufail v. Midwest Hosp., LLC, 2013 WI 62, ¶ 28, 348 Wis. 2d 631, 833 N.W.2d 586 ; Solowicz v. Forward Geneva Nat'l., LLC, 2010 WI 20, ¶ 34, 323 Wis. 2d 556, 780 N.W.2d 111 (explaining that ordinary contract rules apply to interpreting the terms of a restrictive covenant).
¶ 80 "Commercial activity" is susceptible to a clear definition. As the lead opinion does, I turn to the *786 dictionary for assistance. The dictionary includes as definitions of "commercial" the rather obvious "[o]f or relating to commerce" and the more incisive "[h]aving profit as a chief aim." American Heritage Dictionary 380 (3d ed. 1992). I accept the plain meaning of these words, and therefore determine that the covenant is unambiguous.
¶ 81 Applying the restrictive covenant's unambiguous language to the specific activity in this case, I conclude that the short-term vacation rental activity here is prohibited. The record in this case indicates that the Neuschwanders profited handsomely from the rental of their house. They further paid substantial room tax to the City of Hayward and have held the property out as a lodge available for rent in advertisements.
¶ 82 A profit motive was the entire basis of the relationship. The Neuschwanders did not operate the property as a single or two family dwelling. It was advertised to sleep up to 15 people with a maximum of eight cars, regardless of the family relationship. Instead, they conducted a short term transient lodging business and used the property as part of that business enterprise. Both the Neuschwanders and their renters engaged in this enterprise. The very presence of the renters on the property is the result of a commercial exchange. Absent payment, renters would not be able to engage in any activities on the property, such as eating, sleeping, and recreating.
¶ 83 Additionally, the Neuschwanders acquired the property in the first instance through a 1031 tax exchange. See 26 U.S.C. § 1031. A 1031 tax exchange is a process by which certain properties may be exchanged without the I.R.S. recognizing a gain or loss. See id. The catch is that the property exchanged must *787 be "held *658 for productive use in a trade or business or for investment."Id. By seeking the tax advantage that accompanies a 1031 exchange, the Neuschwanders tacitly acknowledge that the property is used for "business," or in other words, "commercial activity."
II
¶ 84 Although I conclude that the Neuschwanders' rental of their property is circumscribed by this restrictive covenant because their activity relates to commerce and has profit as its chief aim, I do not reach my conclusion without pause.
¶ 85 As the lead opinion observes, the breadth of the restrictive covenant at issue raises concern. See lead op., ¶ 22. It could be read to proscribe selling homemade crafts, writing a blog post for compensation, or keeping any kind of home office. On the other hand, it also could be that these activities would be considered de minimus or "incidental to their occupation of the premises as their single family residence."[2] But these facts are not before us.
¶ 86 Although some activities may be close calls as to whether they constitute "commercial activity," the Neuschwanders' vacation rental is not a close call. The language of the covenant is unambiguous and its application to the Neuschwanders does not render an absurd result.
*788 ¶ 87 The breadth of the restrictive covenant, however, is not the only concern. So, too, is the apparent breadth of the lead opinion's holding. Its interpretation of "commercial activity" has ramifications well beyond the facts of this case. Likely there are a myriad of restrictive covenants that use the same or a similar phrase. Are all of those now void? The lead opinion seems to provide a blanket statement favoring the property owner's rights over the rights of others. Yet, it supports its conclusion with only a truncated analysis that does not consider the larger context in which it fits.
¶ 88 The breadth of the lead opinion's holding stands in contrast to the dearth of its analysis. Without sufficient explanation, the lead opinion extols the property rights of the Neuschwanders at the expense of other rights and other property owners.
¶ 89 Pivotal to the lead opinion's analysis is its premise that "[p]ublic policy of the state of Wisconsin 'favors the free and unrestricted use of property.' " Lead op., ¶ 16 (quoting Crowley v. Knapp, 94 Wis. 2d 421, 434, 288 N.W.2d 815 (1980) ). But what about the public policy of this state that favors freedom to contract? Because of the import of freedom to contract, courts in the past have supported the right of property owners to create and enforce covenants affecting their own property. See Solowicz, 323 Wis. 2d 556, ¶¶ 34-35, 780 N.W.2d 111. Which right should prevail under these circumstances and why? The lead opinion does not explain.
¶ 90 Likewise, the lead opinion fails to explain why the property right of the Neuschwanders should prevail over the property rights of their neighbors. Concerns have arisen regarding traffic, noise, and other disturbances. Here the property is comprised of a house located on 2.2 acres. What about the rights of those where the rental is not so distant, but rather the *789 front doors are separated by only a few feet? The lead opinion is silent. *659 ¶ 91 Although espousing to be written narrowly,[3] the lead opinion instead appears to write large, without consideration or analysis of the competing rights and implications of its decision. This is particularly problematic because the rapid development of the short-term rental industry appears to have outpaced the development of the law.[4] State and local legislative bodies[5] as well as courts[6] have only recently been grappling with the weighty issues that attend to this enterprise. *790 ¶ 92 Some courts addressing issues akin to that which we address today employ an analysis and reach a conclusion similar to that set forth in this dissent. See Eager v. Peasley, 322 Mich. App. 174, 911 N.W.2d 470 (Mich. Ct. App. 2017) ; Vonderhaar v. Lakeside Place Homeowners Ass'n, Inc., No. 1021-CA-002193-MR, unpublished slip op., 2014 WL 3887913 (Ky. Ct. App. Aug. 8, 2014). Others embrace a contrary path and conclusion. See Santa Monica Beach Prop. Owners Ass'n, Inc. v. Acord, 219 So.3d 111 (Fla. Dist. Ct. App. 2017) ; Wilkinson v. Chiwawa Cmtys. Ass'n, 180 Wash.2d 241, 327 P.3d 614 (2014).
¶ 93 As new arguments are developed, new fact situations presented, and new legislation passed, the law will continue to evolve in this area. Restrictive covenants will be only one part of this evolution, as they intersect and overlap with the enforcement of local zoning ordinances that attempt to regulate this rapidly growing enterprise. There will inevitably be more litigation surrounding short-term rentals.
¶ 94 This court paints with a broad brush where a more nuanced analysis is required. Lest by the apparent breadth of its decision, the lead opinion unintentionally provides inflexible answers to questions not yet presented. A more nuanced analysis, at least recognizing the important rights it is subjugating, together with an explanation of why, may provide guidance to future courts and litigants as they grapple with the developing issues that attend this burgeoning industry.
¶ 95 Accordingly, for the reasons set forth above, I respectfully dissent.

See ¶ 76 n.1, infra (Ann Walsh Bradley, J., dissenting).

Indeed, the restrictive covenant may be so broad that it is unenforceable.
Although the drafters of the restrictive covenant may have intended only to prohibit brick-and-mortar businesses and the nuisances that come with them (e.g., incessant noise and traffic), the language they used in the covenant is not limited to a prohibition on brick-and-mortar businesses.
It is easy to imagine many unobtrusive activities that could have been conducted on the property in 1982 with the intent to make a profit that would have been prohibited under a literal application of the restrictive covenant. For example, could an attorney work on a case from home and bill for the time? Could an architect work on a design at home? Could an artist produce a work of art at home and mail it to the buyer? These and many other "commercial activities" might be prohibited under the expansive language of the restrictive covenant, even though these activities would have had no effect on neighboring property owners.
Has a restrictive covenant that was broad when it was written in 1982 become practically boundless with the passage of time and the development of technology? The advent of the internet has vastly expanded the universe of activities that can be conducted in one's home for profit. Can online entertainers create content from home and upload that content to sites like YouTube? Can an author write an article and upload it to an online publication from home? Can an investor trade stock online from home? Can a person sell belongings on sites like Craigslist from home?
One might reasonably question whether putting the property up for sale and showing it to potential buyers would be prohibited under a literal application of the restrictive covenant's plain language. However, if the language of the restriction is unambiguous, the language controls. Tufail v. Midwest Hospitality, LLC, 2013 WI 62, ¶¶ 25-26, 348 Wis. 2d 631, 833 N.W.2d 586.

See Stuart v. Weisflog's Showroom Gallery, Inc., 2008 WI 86, ¶ 20, 311 Wis. 2d 492, 753 N.W.2d 448 ("An otherwise unambiguous provision is not rendered ambiguous solely because it is difficult to apply the provision to the facts of a particular case.").

There is no reasonable basis for concluding that "on," in the context of the restrictive covenant, means anything other than physically on the property.

Gibbs v. Williams, No. 14-cv-420-jdp, 2015 WL 5440628, at *1 (W.D. Wis. Sept. 14, 2015).

Columbia Propane, L.P. v. Wis. Gas Co., 2003 WI 38, ¶ 12, 261 Wis. 2d 70, 661 N.W.2d 776 (courts cannot insert into a contract what has been omitted, nor can they rewrite a contract made by the parties).

We do, however, generally frown on them for their obscurantism.

"Lot owners" were the hidden actors of the restrictive covenant. Because they were hidden, identifying them requires a little speculation. But only a little. Lot owners, of course, are the only ones realistically capable of allowing commercial activity on the lots, so it's a pretty safe guess that they are the ones to whom the covenant applies.

"[N]o," as it appears immediately before the direct object, is simply a word of negation. Grammatically, an author may accomplish the negation either by using "no" in conjunction with the object to be negated, or "not" in conjunction with the verb. The meanings are equivalent.