COURT OF APPEALS
DECISION
DATED AND FILED

August 15, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP716**

STATE OF WISCONSIN

Cir. Ct. No. **2020CV135**

IN COURT OF APPEALS
DISTRICT III

---

STELLAR CENTER - HOBART LLC,

PLAINTIFF-APPELLANT-CROSS-RESPONDENT,

V.

ONELEGACY ADVISORS, LLC AND JASEN M. BENTON,

DEFENDANTS-RESPONDENTS-CROSS-APPELLANTS.

---

APPEAL and CROSS-APPEAL from an order of the circuit court for Brown County: KENDALL M. KELLEY, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Stellar Center – Hobart LLC ("Stellar") appeals a circuit court order dismissing its complaint against OneLegacy Advisors, LLC,

and Jasen Benton (collectively, "OneLegacy") for breach of contract. Specifically, Stellar sought damages from OneLegacy for vacating its office space prior to the expiration of its lease with Stellar. Stellar argues that the circuit court erred in determining that OneLegacy had been constructively evicted and was therefore not responsible for paying rent after its eviction. OneLegacy cross-appeals the court's dismissal of its counterclaim for monetary damages arising from Stellar's breach of the lease. We reject the arguments in both the appeal and cross-appeal. Accordingly, we affirm the order dismissing Stellar's complaint and OneLegacy's counterclaim.

## BACKGROUND

¶2    In June 2018, Stellar and OneLegacy entered into a lease of commercial real estate for a three-year period commencing on July 1, 2018, and terminating on June 30, 2021. OneLegacy experienced problems with the leased office space almost immediately, including inadequate air conditioning and internet service, unmaintained landscaping, and burned-out lights. These problems with the office space sometimes forced OneLegacy's staff to work from home.

¶3    After making frequent complaints to Stellar throughout the first seven months of the lease, OneLegacy eventually told Stellar that the lease was "not working out as intended." By email dated January 31, 2019, OneLegacy explained,

> We still have the same issues as when we moved in. The internet is still out at times throughout the day. We end up working from home. The phones still don't work correctly. My telephone won't record messages. This is not good for our business. The heat is stuck at 75 to 80 degrees. We have a mouse problem.

OneLegacy did not receive a response to this email. The problems with the internet and excessive heat continued.

¶4     In early March 2019, OneLegacy complained to Stellar that a new tenant, a spa, was taking over the shared reception space. The spa was playing loud music, using scents, turning down the lights, and leaving towels and blankets in the common area. OneLegacy complained about the same issues regarding the spa in July 2019.[1]

¶5     According to OneLegacy, Benton met with Stellar in mid-July, "in a final effort to address" these various problems with the office space. Following this meeting, OneLegacy continued to experience internet problems. On August 30, 2019, OneLegacy advised Stellar by email that it was vacating the premises, and by letter dated September 3, 2019, OneLegacy informed Stellar that it had vacated the premises.

¶6     On January 27, 2020, Stellar filed a breach of contract action against OneLegacy, seeking rent due under the lease and other damages. OneLegacy filed a counterclaim, alleging that Stellar had breached the lease and constructively evicted OneLegacy. OneLegacy alleged that because of Stellar's breach and constructive eviction, OneLegacy "lost business, was unable to operate its business, and lost reputation and standing among its clients and business associates." OneLegacy sought damages "in an amount exceeding $200,000."

¶7     After a bench trial, the circuit court determined that Stellar had breached its lease with OneLegacy by failing to provide adequate internet, not

---

[1] In June 2019, OneLegacy stopped paying its monthly rent.

fixing the heat in a timely manner, and leasing shared space to a spa. The court further determined that Stellar's breach of the lease amounted to a constructive eviction. On that basis, the court dismissed Stellar's complaint for rent due under the lease. Regarding OneLegacy's counterclaim, the court concluded that OneLegacy had failed to meet its burden of proving damages, and it therefore dismissed OneLegacy's counterclaim. Stellar now appeals the dismissal of its complaint, and OneLegacy cross-appeals the dismissal of its counterclaim.

## DISCUSSION

### I. Stellar's Appeal

¶8     On appeal, Stellar argues that the circuit court erred by admitting extrinsic evidence in interpreting the lease and by determining that Stellar's breach of the lease rose to the level of a constructive eviction. "The interpretation of a contract presents a question of law, which we determine independently of … the circuit court." *Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶22, 348 Wis. 2d 631, 833 N.W.2d 586. "Conversely, when a contract is ambiguous and consequently is properly construed by use of extrinsic evidence, the contract's interpretation presents a question of fact." *Town Bank v. City Real Est. Dev., LLC*, 2010 WI 134, ¶32, 330 Wis. 2d 340, 793 N.W.2d 476.

¶9     In determining whether any breach amounted to constructive eviction, we review the circuit court's findings of fact under the clearly erroneous standard. *See* *Kersten v. H.C. Prange Co.*, 186 Wis. 2d 49, 56, 520 N.W.2d 99 (Ct. App. 1994). "The question of whether the facts fulfill a particular legal standard is a question of law which we decide independently and without deference to the [circuit] court." *Id.*

¶10     Stellar's first set of arguments relates to the circuit court's determination that Stellar breached the lease by failing to provide adequate internet service. Stellar argues that this failure could not be a breach because the lease only required Stellar to pay the cost of "utilities" and it did not require Stellar to provide internet service. Stellar argues that the court erred in determining that this provision of the lease was ambiguous and further erred by admitting extrinsic evidence about the parties' intent as to whether Stellar would provide internet service.

¶11     Prior to trial, Stellar filed a motion in limine to preclude OneLegacy from referring "to or offering evidence of any prior discussions, negotiations and communications between the parties to vary or contradict the written terms" of the lease. Over Stellar's objections, the circuit court admitted Benton's testimony regarding the parties' initial discussions as well as expert testimony from a real estate broker, Timothy Besaw, regarding the expectations created by the language that Stellar had used in advertising its office space. After the bench trial, the court ruled that the clause regarding utilities was ambiguous as to whether Stellar would provide internet service. Because Stellar had advertised the building as "prime office space," however, the court concluded that such space was presumed to include internet service.

¶12     Stellar argues that the circuit court violated the parole evidence rule by admitting this extrinsic evidence. *See **Town Bank***, 330 Wis. 2d 340, ¶¶36-37. Under the parole evidence rule,

> When the parties to a contract embody their agreement in writing and intend the writing to be the final expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in the absence of fraud, duress, or mutual mistake.

*Id.*, ¶36 (citation omitted). "A contract that represents the final and complete expression of the parties' agreement is considered fully 'integrated.'" *Id.*, ¶37. OneLegacy does not dispute that the lease contained an integration clause.

¶13 The existence of an integration clause does not, however, end our inquiry as to whether the circuit court erred in admitting extrinsic evidence regarding the parties' intent. Here, the court concluded that it was permitted to consider extrinsic evidence because the lease was ambiguous regarding the types of utilities that were included in the lease. "[W]hen a contract is ambiguous, a court may consider extrinsic evidence to resolve the parties' intent." *Id.*, ¶38. Therefore, our analysis centers on whether the lease clause regarding utilities is ambiguous. The relevant provision states:

> Landlord will be responsible for the cost of utilities and garbage. Landlord shall not be liable for damages if the furnishing of any utilities is interrupted by fire or other casualty, accident, strike, labor dispute, or disagreement; the making of any necessary repairs or improvements; or any other causes beyond Landlord's reasonable control.

¶14 "The primary goal in contract interpretation is to 'give effect to the parties' intent, as expressed in the contractual language.'" *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶22, 326 Wis. 2d 300, 786 N.W.2d 15 (citation omitted). "We interpret the language 'consistent with what a reasonable person would understand the words to mean under the circumstances.'" *Id.* (citation omitted).

¶15 Stellar argues that the term "utilities" refers only to public utilities that are regulated by the Wisconsin Public Service Commission. As such, Stellar contends that the lease unambiguously excludes internet service, which is unregulated and provided by private companies. Assuming that the meaning of

this lease provision was clear, Stellar contends that the circuit court should not have admitted testimony from Benton or Besaw regarding the parties' negotiations and the typical lease provisions for the type of office space advertised by Stellar. *See Town Bank*, 330 Wis. 2d 340, ¶33 ("If the contract is unambiguous, our attempt to determine the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence." (citation omitted)).

¶16     Stellar offers no authority for its contention that the plain meaning of "utilities" is restricted to public utilities such as heat, light, water, power, natural gas, and sewer services, nor do we agree that Stellar's narrow interpretation of this term is "consistent with what a reasonable person would understand the word[] to mean under the circumstances." *See Maryland Arms Ltd. P'ship*, 326 Wis. 2d 300, ¶22 (citation omitted).  To the contrary, a reasonable person could interpret "utilities" to include internet service.  We therefore conclude that this clause is ambiguous regarding the types of utilities that were to be provided by Stellar under the lease.

¶17     "When … contract language is ambiguous, … 'two further rules are applicable: (1) evidence extrinsic to the contract itself may be used to determine the parties' intent; and (2) ambiguous contracts are interpreted against the drafter.'"  *Id.*, ¶23 (citation omitted).  Accordingly, the circuit court properly admitted extrinsic evidence showing the parties' intent regarding whether Stellar would provide internet service.  Other than Stellar's argument under the parole evidence rule, we see no argument from Stellar that the court erred in admitting testimony from Benton and Besaw regarding the parties' expectation that the lease would include internet service along with other utilities.

¶18     Based on this extrinsic evidence, we further conclude that the term "utilities" as used in the lease was intended to include internet service. Benton testified that during a walk-through of the space, Stellar had represented that internet was included. Also, in advertising the office space that was leased by OneLegacy, Stellar referred to its building as "Class A office space." Besaw testified that Class A office space would typically include the internet alongside other utilities. This evidence therefore demonstrates the parties' intent that the leased office space would include internet service.

¶19     In addition, ambiguous terms may be construed against the drafter. *Id.* As OneLegacy points out, Stellar—which drafted the lease—could easily have specified "that 'utilities' meant regulated public utilities" and "that internet was excluded." Stellar's failure to specify that it would only be responsible for public utilities and that it would not provide internet service further supports the circuit court's determination that the lease included internet service.

¶20     Stellar makes the additional argument that even if we interpret "utilities" to include internet service, the lease only specifies that Stellar "will be responsible for the cost of utilities" and not for "supplying" the utilities. We reject this argument, however, because the very next sentence of the lease can reasonably be construed as absolving Stellar of liability for damages "if the furnishing of any utilities is interrupted" by various factors beyond Stellar's control. The lease can, therefore, be interpreted to provide that Stellar assumed responsibility for furnishing utilities.

¶21     Our determination that Stellar was contractually responsible for supplying utilities, including internet, is further supported by the circuit court's finding that Stellar had, in fact, assumed responsibility for providing internet for

OneLegacy's use by taking steps "to try to correct the deficiency there." For example, in response to an email complaining about the internet issues, Stellar told OneLegacy that "Team Logic will be out in the next few days." The record also includes testimony from Stellar's president that Stellar tried to fix the internet problems for OneLegacy and that Stellar brought in "numerous WiFi people … to try to get this fixed."

¶22     Stellar next asserts that the circuit court erred by determining that Stellar constructively evicted OneLegacy, such that OneLegacy was released from its obligation to pay rent. *See First Wis. Tr. Co. v. L. Wiemann Co.*, 93 Wis. 2d 258, 267-68, 286 N.W.2d 360 (1980). "A constructive eviction constitutes a breach of the covenant for quiet enjoyment." *Id.* at 267.

> Any act of the landlord or of anyone who acts under authority or legal right given to him [or her] by the landlord which so disturbs the tenant's enjoyment of the premises or so interferes with his [or her] possession of the premises as to render them unfit for occupancy for the purposes for which they are leased, is an eviction, and whenever it takes place, the tenant is released from the obligation under the lease to pay rent accruing thereafter.

*Id.* at 267-68. However, "[a] mere slight temporary inconvenience to the tenant does not justify [the tenant] in throwing up his [or her] lease." *Id.* at 268 (citation omitted). Instead, "the breach must be substantial and of such duration that it can be said that the tenant has been deprived of the full use and enjoyment of the leased property for a material period of time." *Id.* (citation omitted).

¶23     OneLegacy's counterclaim alleged several breaches of the lease that it argued amounted to a constructive eviction, including Stellar's failure to provide adequate internet, maintain the landscaping, fix burned-out lights, and address complaints regarding excessive heat in a timely manner. OneLegacy also argued

9

that sharing building space with a spa "substantially interfered with the operation of [its] business."

¶24 The circuit court found that the problems with landscaping and the lights were not significant enough to rise to the level of a constructive eviction. However, the court found that "the internet was not even meeting the lowest threshold of usability" for OneLegacy's business and that the excessive heat "rendered the spaces unusable." Regarding OneLegacy's complaint that it was forced to share common space with a spa, the court determined that "[i]t would be difficult not to conclude that the co-tenant was in an incompatible business with that business setting." In addition to being "clearly … incongruous with the general expectations of a professional business and office setting," the spa created "data security and customer confidence … problem[s]" for OneLegacy. Likewise, the court found that the spa's use of music was a violation of the lease. The court explained that the spa violation, standing alone, was probably not a basis for OneLegacy to vacate the premises, but that this violation was "in a context of all of these other things." The court determined that Stellar's breach of the lease "rendered the space practically unusable and unsuitable," resulting in a constructive eviction.

¶25 Stellar argues that "none of the things [OneLegacy] complained to Stellar about so interfered with its possession of the premises as to render them unfit for occupancy for the purpose of running its business." Stellar takes issue specifically with the circuit court's determinations regarding the problems OneLegacy experienced with its spa co-tenant and with the excessive heat.

¶26 Regarding the spa co-tenant, Stellar argues that "OneLegacy's chief complaint about the common space was that another tenant was using it." Stellar

argues that we should disregard OneLegacy's complaints about the spa because the lease clearly states that tenants will share the front desk, front entrance, and lobby area. We disagree with Stellar's characterization of OneLegacy's complaint regarding the spa. OneLegacy did not complain merely about having to share common space with another tenant. Rather, OneLegacy complained about the spa's *activities* in that shared common space, which included playing music, using scents, and putting out towels and blankets. The circuit court found that these activities were "clearly … incongruous with the general expectations of a professional business and office setting."

¶27 Stellar does not directly address the circuit court's finding but instead argues that "OneLegacy needed to adjust its expectations." Stellar points to *Tufail* as an instructive example of a case where "a tenant had to adjust [its] expectations when [its] hours of operation were limited by a municipal agency outside the landlord's control." We disagree that *Tufail* is instructive here, where the selection of the spa as a co-tenant was entirely within the landlord's control, and we conclude that the court's determination that OneLegacy's "co-tenant was in an incompatible business with that business setting" was not clearly erroneous.

¶28 Regarding the heat, Stellar argues that it was fixed on June 26, 2019, the day after OneLegacy stopped paying rent. Relying on *First Wisconsin Trust Co.*, 93 Wis. 2d at 270, Stellar contends that the excessive heat could therefore not be a basis for finding a constructive eviction. In *First Wisconsin Trust Co.*, the tenant pointed to damage that had occurred in 1962, 1965, and May 1971 as a basis for terminating the lease in September 1972. *Id.* at 269. The parties had already settled a prior lawsuit regarding unpaid rent and quiet enjoyment in July 1971, and the record did not demonstrate any further breach after July 1971. *Id.* at 269-70. Given that timeline, our supreme court concluded that "[t]he facts

of this case would not support a finding that the defendant abandoned the demised premises within a reasonable time after any alleged breach." *Id.* at 270.

¶29 The timeline of events in *First Wisconsin Trust Co.* is readily distinguishable from the timeline in the present case. Here, the record shows that OneLegacy complained about the excessive heat for almost one full year before Stellar fixed the air conditioning system. The circuit court found that the excessive heat had "rendered the space unusable."[2] Based on this finding, we agree that Stellar's breach was "substantial and of such duration that it can be said that the tenant [was] deprived of the full use and enjoyment of the leased property for a material period of time." *See id.* at 268 (citation omitted).

¶30 In addition, Stellar concedes that it did not fix the heat problem until OneLegacy began withholding rent. Unlike the parties in *First Wisconsin Trust Co.*, the facts of this case support a finding that OneLegacy withheld rent and abandoned the demised premises within a reasonable time after Stellar's breach. There is no evidence that Stellar took any steps to resolve the parties' dispute over whether Stellar breached the lease until after it had subjected OneLegacy to almost one full year of excessive heat in the leased premises.

¶31 Moreover, even if we agreed with Stellar's arguments regarding the heat and the spa, Stellar has failed to address the circuit court's determination that "the internet was not even meeting the lowest threshold of usability" for OneLegacy's business. Stellar instead relies entirely on its argument that "internet

---

[2] In its reply brief, Stellar argues that the excessive heat affected only two of the six offices that OneLegacy was leasing. We disagree with Stellar's suggestion that this fact undermines OneLegacy's claim for constructive eviction. It is not reasonable to expect a business to be able to operate when one-third of its offices are unusable.

service was not an included service in the lease, so it cannot form the basis for constructive eviction." Because we have already resolved that issue against Stellar, and the record supports the court's finding that Stellar failed to provide internet that satisfies "the lowest threshold of usability," we conclude that the leased premises were unfit for OneLegacy's purposes. Accordingly, this breach alone is sufficient for us to affirm the court's determination that OneLegacy was constructively evicted. *See First Wis. Tr. Co.*, 93 Wis. 2d at 267-68.

¶32 Stellar's final argument is that OneLegacy did not vacate the leased premises until the end of August 2019. Stellar contends that this timing indicates that OneLegacy "was clearly able to operate its business … because it did so for over a year." We see two problems with this argument. First, as Stellar points out elsewhere in its brief, "if there is a substantial breach of [a] lease, [a] landlord is entitled to notice [of the alleged breach] and has a reasonable time after notice is given to remedy the defect." *Id.* at 270. Thus, the fact that OneLegacy did not vacate the leased premises immediately does not undermine its claim for constructive eviction.

¶33 In addition, the record does not support Stellar's argument that OneLegacy was able to operate its business for the duration of its time in the leased premises. Among other things, the evidence showed that the inadequate internet prohibited OneLegacy from using the office space to conduct webinars. As a result, Benton had to do this work from home. The excessive heat and unreliable internet also forced employees to work from home at times. The record therefore supports the conclusion that OneLegacy was "deprived of the full use and enjoyment of the leased property for a material period of time." *See id.* (citation omitted). Accordingly, we affirm the circuit court's determination that

13

OneLegacy was constructively evicted and therefore not responsible for unpaid rent. *See id*. at 267-68.

## II. OneLegacy's Cross-Appeal

¶34    OneLegacy argues that the circuit court erred by finding that OneLegacy did not meet its burden of proving damages and dismissing its counterclaim.  The court explained that in the absence of evidence to quantify OneLegacy's losses, the court would have to speculate "as to what those specific losses were."

¶35    In its cross-appeal, OneLegacy first argues that the record clearly supports an award of $54,000 for the rent it paid for a space that it could not use. Stellar responds that OneLegacy did not specifically ask the circuit court for a refund of rent already paid.  As a general rule, "issues not considered by the circuit court will not be considered for the first time on appeal." *See Jackson v. Benson*, 218 Wis. 2d 835, 901, 578 N.W.2d 602 (1998).  OneLegacy provides citations to the record that it asserts support its argument for a refund of rent.  OneLegacy's citations to the record, however, do not support its claim that it asked the court for this specific category of damages.

¶36    Appellate courts have, on occasion, opted to address newly raised legal arguments that are adequately briefed.  *See, e.g.*, *Binder v. Madison*, 72 Wis. 2d 613, 618, 241 N.W.2d 613 (1976) ("Because the issue involves a question of law rather than of fact, and has been briefed by both sides, we hold that it is one of sufficient public interest to merit decision.").  Here, however, OneLegacy offers no legal authority to support its argument that, having found a constructive eviction, the circuit court was required to award damages for all rents paid by OneLegacy under the lease.  We are not obligated to consider "[a]rguments

14

unsupported by reference to legal authority." *State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992). We therefore reject OneLegacy's argument that the court was required to award a minimum of $54,000 in damages.

¶37 OneLegacy's second argument is that the circuit court should have awarded damages for "lost income because of its inability to operate its business at the Stellar building." To support its claim for lost income, OneLegacy points to Exhibit 73, which "is an accurate representation of OneLegacy's income on a six[-]month basis starting in January 2017 through June of 2021." According to OneLegacy, this exhibit "show[s] that after [it] moved out of Stellar's building[,] its income went up significantly."

¶38 The circuit court admitted Exhibit 73 "not for the truth of the matter asserted here as to concrete numbers, but with respect to the degree to which it complements the testimony of [OneLegacy] in this action, who had just indicated that there were financial differences there." OneLegacy does not develop any argument that the court erred in admitting Exhibit 73 for this limited purpose.

¶39 In support of its argument that that the differences in income before and after OneLegacy vacated the leased premises identified on Exhibit 73 were caused by the inadequate office space and provided a basis for the circuit court to award damages on its counterclaim, OneLegacy points to Benton's testimony that OneLegacy was unable to conduct webinars due to the inadequate internet and telephone services. OneLegacy does not, however, identify anything in the record that would permit the court to determine the specific amount of lost income associated with OneLegacy's failed webinar attempts. The mere increase in income after OneLegacy vacated the leased premises, by itself, is not a basis to grant a loss of income award, as there are too many other variables that could

15

provide a basis for that income increase. We therefore agree that OneLegacy failed to meet its burden of proof regarding loss of income damages, as the court would have been required to speculate as to the amount of OneLegacy's loss. *See Lindevig v. Dairy Equip. Co.*, 150 Wis. 2d 731, 740, 442 N.W.2d 504 (Ct. App. 1989) ("Damages for lost profits need not be proven with absolute certainty, but the claimant must produce sufficient evidence … on which to base a reasonable inference as to a damage amount.").

¶40    We therefore affirm the circuit court's dismissal of OneLegacy's counterclaim.

¶41    No costs are awarded to either party.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2021-22).

16