**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**May 12, 2022**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1257**

Cir. Ct. No. 2020CV273

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

MICHAEL H. RENNHACK,

    PLAINTIFF-APPELLANT,

  V.

ROY H. RENNHACK, HOWARD H. RENNHACK, JR., AND
HOWARD H. RENNHACK, SR.,

    DEFENDANTS-RESPONDENTS,

RENNHACK CONSTRUCTION CO., INC.,

    DEFENDANT.

---

       APPEAL from an order of the circuit court for Dodge County: JOSEPH G. SCIASCIA, Judge. *Affirmed*.

       Before Blanchard, P.J., Graham, and Nashold, JJ.

¶1 GRAHAM, J. Michael Rennhack appeals a circuit court order granting summary judgment in favor of Roy Rennhack, Howard Rennhack, Jr., and Howard Rennhack, Sr.[1] Michael argues that the terms of a shareholder agreement, which he contends are unambiguous, require Roy to sell his shares in a closely held family business, Rennhack Construction Co., Inc.[2] We conclude that the pertinent provisions in the shareholder agreement are ambiguous. However, no party has offered extrinsic evidence to resolve the ambiguity. Therefore, the circuit court properly interpreted the contract on summary judgment as a matter of law. We further conclude that the circuit court's interpretation of the agreement is the most reasonable available interpretation. Therefore, we affirm.

## BACKGROUND

¶2 Rennhack Construction Co., Inc. is a family-owned business established in 1972. It currently has four shareholders: Howard Sr., who founded the company and is now retired, and Howard Sr.'s three sons, Michael, Roy, and Howard Jr. Up through 2016, at least, the three Rennhack brothers were the sole directors and officers of the company.[3] Additionally, up through 2016, all three brothers were employed by the company in positions related to its day-to-day operations. For his part, Roy was employed as a construction crew supervisor.

---

[1] Because they share a family name, we refer to Michael, Roy, Howard Jr., and Howard Sr. by their first names.

[2] For ease of reference, we sometimes refer to Rennhack Construction as the company.

[3] Pertinent to this dispute, Michael is the president of the company and Roy has been its secretary and treasurer.

¶3     In 2003, well before the current dispute, the company and its four shareholders entered into the shareholder agreement that is at issue here.  The current dispute is about the legal effect—if any—that Roy's decision to terminate his employment in 2016 has under the agreement.  We discuss the agreement's pertinent terms in detail below.

¶4     Roy provided notice to the company that he intended to "terminate his employment from the Company effective February 1, 2016."  The notice did not specify whether he intended to resign from his position as a crew supervisor only, or whether he also wished to resign from his role as an officer and his role as a director.

¶5     At the same time, Roy initiated negotiations with the other shareholders to sell his shares to them or to the company itself.  The parties engaged in a process to determine the value of Roy's shares, but they were unable to agree on a share price.  An appraiser determined that the total fair market value of Roy's shares was $569,826.  However, due to a failure to agree on the correctness of the appraised share value, Roy's attorney informed the company in 2017 that Roy would not be selling his shares.  Roy continued to serve as an officer and director of the company, at least in name.  His signature is on company construction contracts and company checks from the time period following his resignation, and annual filings with the state department of financial institutions have listed Roy as an officer and a director at least through 2020, the year in which the parties submitted their summary judgment materials to the circuit court.

¶6     The conflict over the family business eventually escalated.  In April 2020, Michael's legal counsel advised Roy, by letter, that the company was purchasing Roy's shares for the appraised value.  The letter also stated that Roy

owed the company $225,452.17 for distributions and benefits that he improperly received after he terminated his employment in 2016, and that his debts to the company would be deducted from the purchase price of Roy's shares.

¶7      Roy and Howard Jr. called a special meeting of the shareholders and directors, at which they purported to issue five additional shares to each of the company's shareholders. The effect of this issuance of shares would have been to change the voting power of different blocks of shareholders, and it would have deprived Michael of his existing effective veto power over certain company decisions. Michael objected to the actions at the shareholder meeting on multiple grounds. Pertinent to this appeal, Michael argued that, under the shareholder agreement, Roy was obligated to sell his shares upon termination of his employment with the company. Therefore, Michael asserted, Roy could not properly call a special meeting of the shareholders and could not vote his shares at any special meeting.[4]

¶8      In July 2020, Michael commenced this action by filing a complaint in the circuit court, which names Roy, Howard Jr., and Howard Sr., as defendants.[5] In addition to requesting relief concerning actions taken at the

---

[4] Based on a subsequent stipulation by the parties, the shares that had purportedly been issued at the special meeting were rescinded. Neither the issuance of these shares nor their rescission is directly at issue in this appeal.

[5] Michael's complaint also names Rennhack Construction as a defendant; however, the circuit court determined that this is effectively a dispute between two factions of shareholders. Based on a stipulation between the other parties, the court determined that the company was not required to answer the complaint and would not be considered in default for not answering.

When Michael filed his notice of appeal, he identified Rennhack Construction as a respondent. Upon our review of the record and the parties' briefing, we have determined that Michael is not challenging any circuit court decision in favor of the company. Therefore, on our own motion, we now order the clerk to amend the caption in this appeal to reflect that the company is a defendant, but not a respondent.

special meeting, Michael also seeks specific performance of Roy's obligations under the shareholder agreement. More specifically, Michael interprets the agreement as obligating Roy to transfer his shares to the company in exchange for $344,373.83,[6] and Michael seeks an order compelling Roy to do so.[7]

¶9 Michael moved for summary judgment. At a hearing, the circuit court identified the ultimate question as whether Roy is required to sell his shares at the appraised price pursuant to the shareholder agreement. And, as discussed at length below, that question comes down to the meaning of the term "employment," as that term is used in section 6.01 of the agreement. If it refers exclusively to Roy's position as a construction crew supervisor, then Roy is obligated under the agreement to sell his shares after resigning from that position. However, if it could encompass his other roles in the company as an officer or director, then Roy is not obligated to sell his shares.

¶10 The circuit court initially questioned whether it could resolve the dispute over the meaning of the shareholder agreement as a question of law on summary judgment, or whether there are material factual disputes that would

---

[6] This sum is the appraised value of Roy's shares minus the amount that Michael claims Roy owes the company.

[7] The complaint also seeks damages from Roy and Howard Jr. based on alleged breach of the implied duty of good faith and fair dealing, and injunctive relief prohibiting any further votes and actions by the directors and shareholders during the pendency of the lawsuit. These claims are not at issue in this appeal. Likewise, Roy, Howard Sr., and Howard Jr. all filed cross-claims against the company for indemnification, but the cross-claims are not at issue in this appeal. As a result, we discuss these claims and cross-claims no further.

Although Howard Sr. and Howard Jr. are respondents in this appeal, Michael and Roy appear to be the central figures in this dispute, with Howard Sr. and Howard Jr. playing a secondary role. Therefore, when addressing arguments advanced by Roy, Howard Sr., and Howard Jr., we sometimes refer to them as Roy's arguments.

require a trial. In the supplemental briefing that followed, Michael acknowledged that the agreement contained "some duplicative or inartful language," and Roy conceded that it was "not a model of clarity or careful draftsmanship." Nevertheless, while their reasoning and interpretations differed, Michael and Roy both insisted that pertinent terms of the agreement could be interpreted as a matter of law. For his part, Michael argued that the agreement is unambiguous, presenting a question of law for the circuit court to decide. For his part, Roy argued that portions of the agreement are ambiguous, but that it is not ambiguous as a whole, and that it has to be interpreted as a matter of law because "no extrinsic evidence or other circumstances exist for the court to consider."

¶11 The circuit court issued a written decision granting partial summary judgment in Roy's favor. It concluded that, even though the pertinent contract provisions were not models of clarity and appeared to conflict, Roy's interpretation was the better one. Therefore, it determined, Roy was not required to sell his shares as a result of the termination of his employment as a construction crew supervisor. Apart from Michael's claim regarding the issuance of new shares at the special meeting discussed above, the court granted summary judgment to the defendants on all other claims.

¶12 The circuit court later issued a final order resolving all remaining matters in litigation between the parties. Michael appeals the court's determination that, under the terms of the shareholder agreement, Roy remains a director and officer and is not obligated to sell his shares.

**DISCUSSION**

¶13 "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Affordable Erecting, Inc. v. Neosho Trompler, Inc.*, 2006 WI 67, ¶19, 291 Wis. 2d 259, 715 N.W.2d 620 (quoting WIS. STAT. § 802.08(2) (2019-20)). "We review summary judgment de novo, viewing the facts in the light most favorable to the non-moving party … and making all reasonable inferences in [the non-moving party's] favor." *Id.*

¶14 Resolution of this appeal turns on whether, based on the terms of the shareholder agreement, Roy is obligated to sell his shares at the appraised price because he is no longer employed as a construction crew supervisor. This requires us to interpret the agreement, which is a contract between the company and its shareholders.

¶15 "Contract interpretation generally seeks to give effect to the parties' intentions." *Tufail v. Midwest Hospitality, LLC*, 2013 WI 62, ¶25, 348 Wis. 2d 631, 833 N.W.2d 586. "We presume the parties' intent is evidenced by the words they chose" to use, and therefore, "unambiguous contract language controls contract interpretation." *Id.*, ¶¶26, 25. A contract provision is unambiguous if it is susceptible to only one construction. *Id.*, ¶27. When the meaning of a contract is unambiguous, its interpretation is limited to the four corners of the contract, and we construe it as a matter of law according to its literal terms. *Id.*, ¶26. On the other hand, if the terms of the contract are ambiguous, the parties may introduce extrinsic evidence, and such evidence may be used to determine the parties' intent. *Town Bank v. City Real Estate Dev.*, 2010 WI 134, ¶32, 330 Wis. 2d 340, 793 N.W.2d 476. In such cases, our supreme court has explained that interpretation of the contract presents a question of fact to be decided by a jury. *Id.*

¶16     In this case, for reasons that we explain further below, we conclude that the pertinent portions of the shareholder agreement are ambiguous when they are read as a whole. However, neither Michael nor Roy argues that a trial was needed to determine the meaning of the agreement, nor do they argue that its interpretation turns on any extrinsic evidence. On the contrary, both sides urged the circuit court to interpret the language of the agreement as a matter of law, applying the canons of construction that are used to discern contract meaning.

¶17     This approach is consistent with Wisconsin law. In *Bauman v. Midland Union Ins. Co.*, 261 Wis. 449, 451-52, 53 N.W.2d 529 (1952), for example, our supreme court stated that, if a provision in an insurance contract is ambiguous and there is no extrinsic evidence bearing on the meaning intended by the parties, the proper interpretation is to be determined by the court as a question of law. In a more recent case from our supreme court involving the interpretation of a business agreement, three dissenting justices observed (with no stated concern by the majority) that contract interpretation "is a question of law for the court if the contract is unambiguous or if the contract is ambiguous but no extrinsic evidence has been presented." *Seitzinger v. Community Health Network*, 2004 WI 28, ¶69, 270 Wis. 2d 1, 676 N.W.2d 426 (Abrahamson, C.J., dissenting).[8]

---

[8] The *Seitzinger* dissent cites two contract law treatises, both of which support this proposition outside of the insurance law context. *See Seitzinger v. Community Health Network*, 2004 WI 28, ¶54, 270 Wis. 2d 1, 676 N.W.2d 426 (Abrahamson, C.J., dissenting) (citing 11 RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:7 (4th ed. 1999); 5 MARGARET A. KNIFFEN, CORBIN ON CONTRACTS § 24.6 (rev. ed. 1998). More specifically, the Williston treatise states that, "[i]n the absence of relevant extrinsic evidence, any ambiguity in a written contract may be resolved by the court as a matter of law. Furthermore, if a contract is ambiguous, its interpretation is a question of law for the court as long as the extrinsic evidence bearing on the interpretation is undisputed." WILLISTON, § 30:7; *see also id.* (cumulative supplement) (citing *Wicklund v. Sundheim*, 2016 MT 62, ¶16, 383 Mont. 1, 367 P.3d 403 (2016), for the proposition that, "[i]n the absence of relevant extrinsic evidence, any ambiguity in a written contract is resolved by the court as a matter of law.").

Accordingly, like the circuit court, we interpret the ambiguous contract language as a matter of law without the aid of any extrinsic evidence to resolve the ambiguity.

¶18 We now turn to that contract language. The parties direct us to three provisions of the shareholder agreement: section 3 ("Termination of Employment, Shareholders Must Buy"); section 8.05.04 (defining "Employee-Shareholder"); and section 6.01 ("Termination"). We set forth these provisions in full, addressing various arguments by the parties along the way.

¶19 Section 3, titled "Termination of Employment, Shareholders Must Buy," provides that shareholders "shall be deemed to have offered to sell all of [their] … shares of the stock" if they cease to be "Employee-Shareholders":

> The parties desire to limit the ownership of stock to Employee-Shareholders, it being in the best interests of the Corporation and the Shareholders. Therefore, it is agreed that *any Shareholder who, at any time, ceases to [be] an Employee-Shareholder as a result of termination of employment by the mutual consent of the Shareholder and the Corporation*, termination of employment by the Corporation pursuant to Section 1, or because the Shareholder is a Disabled Shareholder, *shall be deemed to have offered to sell all of his or her shares of the stock* to the other Shareholders for the Agreement Price and on the Agreement Terms. Such offer shall be deemed made on the date on which such Shareholder ceased to be an Employee-Shareholder. The other Shareholders may accept such deemed offer and buy all of the offered stock, in proportion to their respective ownership of the stock (excluding the offered stock), or in such other proportion as they shall agree upon. In the event the other Shareholders do not accept the offer within 60 days, then the Corporation shall accept such deemed offer and purpose all of the offered shares. The price and payment terms shall be set forth in section 5.01-5.03. Nothing in this Agreement imposes any obligation on the Corporation to employ any Shareholder. The parties to this Agreement acknowledge that Howard Rennhack, Sr. is no longer an employee of the

Corporation and agree that this provision requiring non-employees to sell their stock shall not apply to him.

(Emphasis added.)

¶20 Section 8.05.04 defines "Employee-Shareholder" as "a Shareholder who is also an officer, employee *or* director (*or some combination thereof*) of the Corporation." (Emphasis added.)

¶21 Michael interprets section 3 to mean that a shareholder who is no longer an employee "ceases to [be] an Employee-Shareholder" and, in turn, also ceases to be an officer or director of the company. However, section 8.05.04 specifically defines "Employee-Shareholder" as a shareholder "who is also an officer, employee, or director," "or some combination thereof." In other words, this definition unambiguously contemplates that a shareholder remains an "Employee-Shareholder" if he is an officer or director but not an "employee." It would have been easy to include language in the agreement stating that a shareholder who is an officer or director ceases to have those roles if he ceases to be an "employee" of the company, but no such language appears in section 3 or in any other section. Michael's assertions about the meaning of section 3 are not consistent with its language, especially when considered in light of the unambiguous definition of Employee-Shareholder found in section 8.05.04.

¶22 If sections 3 and 8.05.04 were the only pertinent provisions, we would have no problem concluding that the shareholder agreement is unambiguous when applied to the facts here. Under this hypothetical agreement, its unambiguous terms would provide as follows. Despite Roy's resignation as a construction crew supervisor, he continues to be an Employee-Shareholder, as that term is defined in section 8.05.04. That is because Roy continues to be an officer

and director (indeed, he would need to be only one or the other and not both), and he has not been removed from either of those positions through the process for removal set forth in the shareholder agreement. Therefore, if we were to interpret sections 3 and 8.05.04 in isolation, we would conclude that Roy has not "cease[d] to [be] an Employee-Shareholder as a result of termination of employment," and that the provisions of section 3 are inapplicable.

¶23 However, sections 3 and 8.05.04 are not the only pertinent provisions in the shareholder agreement. The ambiguity in the shareholder agreement is introduced by section 6.01, titled "Termination." That section provides:

> In the event any Shareholder shall voluntarily or involuntarily be terminated from his employment with the Corporation, or in the event of retirement or disability as hereinafter defined, said Shareholder shall sell and the other Shareholders or Corporation as the case may be shall purchase all of said Shareholder's stock in the Corporation. As set forth at the end of Section 3, this provision shall not apply to Howard Rennhack, Sr.

¶24 Michael and Roy disagree about the proper interpretation of this section. Michael contends that section 6.01's reference to "employment" refers exclusively to Roy's role as a construction crew supervisor, and that, under a plain language interpretation, Roy must sell his shares because he has resigned from that position. By contrast, Roy contends that section 6.01's reference to "employment" is best interpreted to include officer and director roles, consistent with the shareholder agreement's definition of "Employee-Shareholder."

¶25 To be clear, if section 6.01 existed in isolation, we would have concluded that Michael has offered the most reasonable interpretation of that section. However, we do not read contract provisions in isolation. A provision

11

that is unambiguous in isolation may become ambiguous when considered alongside other contractual provisions (and vice versa). *See Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶¶39-40, 326 Wis. 2d 300, 786 N.W.2d 15; *MS Real Estate Holdings, LLC v. Donald P. Fox Fam. Trust*, 2015 WI 49, ¶43, 362 Wis. 2d 258, 864 N.W.2d 83. Here, section 6.01's reference to "employment" becomes ambiguous when read in conjunction with section 3 and the definition of "Employee-Shareholder" found in section 8.05.04. This is because, as we have discussed, a plain meaning interpretation of section 6.01 suggests that a shareholder must sell his shares if he ceases to be an employee of the company. By contrast, a plain meaning interpretation of sections 3 and 8.05.04 suggests that a shareholder remains an "Employee-Shareholder," and need not sell his shares, if he remains an officer or director but not an employee.

¶26    When we consider the shareholder agreement as a whole, as we must, neither Michael's interpretation nor Roy's interpretation is entirely satisfying, and both interpretations violate certain canons of construction that courts use to determine contract meaning. We now acknowledge the problems inherent in both interpretations, and then explain why we agree with the circuit court that Roy has offered the least problematic (and thus, the most reasonable) interpretation of the agreement.

¶27    Roy's argument that section 6.01's reference to "employment" includes his roles as an officer and director is problematic because courts generally presume that the parties' intent is conveyed by the words they use in a contract. *Tufail*, 348 Wis. 2d 631, ¶26. In some situations, it is reasonable to presume that, when parties choose to use two different words, they intend to convey different meanings. *Cf. Nelson v. McLaughlin*, 211 Wis. 2d 487, 496, 565 N.W.2d 123 (1997) (applying this concept in the context of the legislature's choice of statutory

12

language). Roy offers no reason besides a lack of careful draftsmanship to explain why the parties used the undefined term "employment" rather than the defined term "Employee-Shareholder" in section 6.01. Additionally, if Roy's interpretation is correct, the provisions in section 6.01 are largely duplicative of provisions already found in section 3. *See Maryland Arms*, 326 Wis. 2d 300, ¶45 ("When possible, contract language should be construed to give meaning to every word, 'avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage.'") (quoted source omitted).

¶28 On the other hand, Michael's interpretation would render definitions and provisions in the shareholder agreement entirely meaningless. As stated above, Michael contends that section 6.01's reference to "employment" refers exclusively to Roy's former employment as a construction crew supervisor, not to his roles as an officer or director. However, Michael offers no persuasive reason why, if that is so, the parties purposefully included the defined term Employee-Shareholder in the agreement and defined it to include shareholders who are officers or directors but not employees. As explained above, section 3 unambiguously provides that Roy can continue to be a shareholder because he continues to be an Employee-Shareholder by virtue of being a shareholder who is an officer and director. If, despite this language, Roy must sell his shares under section 6.01 because he is no longer employed as a construction crew supervisor, the definition of "Employee-Shareholder" and the provisions in section 3 are surplusage. *See id.*

¶29 Based on our independent review of the entirety of the shareholder agreement, we agree with the circuit court that, despite its flaws, Roy's interpretation is more reasonable than Michael's interpretation. Roy's interpretation better harmonizes the contract provisions by avoiding a direct

conflict between section 3 and section 6.01, and thus, resolves the ambiguity in a manner that does the least harm to what appears to have been the shareholders' intent when they entered into the agreement. The only place the defined term "Employee-Shareholder" appears in the agreement is in section 3, which specifically states that the company and shareholders "desire to limit the ownership of stock to Employee-Shareholders." This is a clear expression of the parties' intent. As discussed above, Roy remains an Employee-Shareholder if he is a shareholder and an officer or director but not an "employee." Section 6.01 contains a reference to section 3, suggesting that the parties meant these sections to be read together to protect the same interests and rights. It would be unreasonable to conclude that section 3 protects Roy's right to remain a shareholder by virtue of his continued roles as an officer or a director and, at the same time, conclude that section 6 eviscerates that same right. Therefore, we conclude that the references to "employment" in section 6.01 include roles as an officer or director.

¶30    We now briefly address Michael's remaining arguments. Michael argues that only his interpretation results in a consistent interpretation of the term "employee" and "employment" across provisions of the shareholder agreement. Admittedly there is some force to this argument, but not enough to overcome the reasons we have given for concluding that Roy's interpretation of the agreement is more reasonable than Michael's. From our discussion above, it is apparent that the drafter of the shareholder agreement did not use care to avoid internal inconsistencies and conflicts, and this particular inconsistency is not as glaring as the inconsistency discussed above that would result from Michael's interpretation of the agreement.

¶31    Along similar lines, Michael argues that, if section 3's reference to "employment" encompasses Roy's role as an officer or a director, then Roy necessarily resigned from these roles when he sent a notice stating that he intended to terminate his employment effective February 1, 2016. But assuming without deciding that Roy intended to relinquish all positions with the company when he sent his resignation letter in 2016, Michael does not develop any legal argument, apart from the contract interpretation we have already rejected, showing that Roy was obligated to follow through with those resignations. Whatever Roy may or may not have intended to convey in his resignation notice, he remained an officer and director of the company through at least 2020, when the parties filed their summary judgment materials. As stated, the company's annual filings with the state department of financial institutions continued to identify Roy as an officer and director.

¶32    Finally, Michael advances an argument that diverges from the agreement's contractual language, and instead focuses on Roy's actions. Michael argues that, by offering to sell his shares upon notice that he intended to terminate "his employment," Roy effectively acknowledged that the shareholder agreement obligated him to sell. We reject this argument. Roy might have wished to sell his shares in the company, but that does not necessarily mean that the language of the agreement obligated him to do so.

¶33    Because we have concluded that the most reasonable interpretation of the shareholder agreement does not obligate Roy to sell his shares, we do not address the parties' remaining arguments, including their arguments about the purchase price.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.