**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**September 14, 2023**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2022AP1413**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020CV1893

**IN COURT OF APPEALS**
**DISTRICT IV**

VAT MASTER CORP. AND VAT MASTER LIMITED PARTNERSHIP,

    PLAINTIFFS-RESPONDENTS-CROSS-APPELLANTS,

  V.

ALMANAC REALTY SECURITIES V, LP, TWP-FARS CORP., TW-ARS CORP., MOREEN R. MCGURK, AS EXECUTOR OF THE ESTATE OF JOHN MCGURK, AND JUSTIN HAKIMIAN,

    DEFENDANTS-APPELLANTS,

ALMANAC REALTY INVESTORS, LLC, MATTHEW KAPLAN AND RANDALL GUENTHER,

    DEFENDANTS-CROSS-RESPONDENTS.

       APPEAL AND CROSS-APPEAL from an order of the circuit court for Dane County:  SUSAN M. CRAWFORD, Judge.  *Affirmed.*

       Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

¶1     BLANCHARD, J. VAT Master Corporation and VAT Master Limited Partnership (collectively, "VAT") claim that four entities and four individuals (collectively, "the Almanac defendants") breached a 2013 agreement intended to settle disputes between the two sides. VAT's specific claim is that in 2014 and again in 2015 the Almanac defendants breached corporate governance rules that were newly established in, and enforceable through, the 2013 settlement agreement.

¶2     The Almanac defendants moved the Dane County Circuit Court to dismiss VAT's operative complaint against all defendants based on the failure to state a claim, arguing that the settlement agreement does not itself create an independent obligation to follow the corporate governance rules described in the settlement agreement. Instead, the Almanac defendants argue, the settlement agreement requires only that the parties amend a corporate operating agreement to reflect the new corporate governance rules at issue, which is an amendment that both sides agree occurred. The court denied the motion to dismiss on the ground that the settlement agreement itself unambiguously creates the obligation to follow the new corporate governance rules. We granted the Almanac defendants' petition for an interlocutory appeal.

¶3     We affirm denial of the motion to dismiss, but based on a different rationale from the circuit court's. We conclude that dismissal is not appropriate because the settlement agreement is fairly susceptible to more than one reasonable interpretation as to whether the settlement agreement independently obligates the parties to follow the new governance rules. Therefore, proper interpretation of the ambiguously worded agreement will require a factfinder to consider extrinsic evidence about the mutual intent of the parties, assuming that relevant extrinsic evidence is available and that the evidence creates a genuine issue of material fact.

¶4      Separately, the Almanac defendants appeal a circuit court ruling that involves only John McGurk and Justin Hakimian, two signers of the settlement agreement.  McGurk and Hakimian moved to be dismissed on the ground that they cannot be sued in their individual capacities, because they signed solely in their capacities as members of a corporate board.  The circuit court rejected that argument.  We conclude that the only reasonable interpretation of the settlement agreement is that McGurk and Hakimian are parties to it, each signing in an individual capacity, and that the operative complaint states claims for breaches of the contractual duties that McGurk and Hakimian individually owe to the VAT plaintiffs.  Accordingly, we affirm the circuit court on this issue.

¶5      In a cross appeal, VAT argues that the circuit court erred in dismissing this action against Randall Guenther, who is not a party to the settlement agreement, and Matthew Kaplan, who is a party to it.  The court ruled that the operative complaint fails to state claims against either Guenther or Kaplan upon which relief may be granted.  We agree with the circuit court in each case and, accordingly, also affirm the order dismissing the claims against them.

## BACKGROUND

*Allegations in VAT's Complaint*

¶6      Broadly summarized, VAT alleges the following in its operative complaint.[1]  Beginning in 2007, VAT entered into agreements with various

---

[1]  Both sets of appellate briefs share a repeated shortcoming that has created unnecessary work for this court.  For the most part, in the places in the briefs where the parties should be citing to the record both sides exclusively cite to the appendices of the appellate briefs.  We remind counsel that this violates WIS. STAT. RULE 809.19(1)(e) (2021-22), which requires citations to

Almanac defendants under which the Almanac defendants invested in VAT's real estate business, but the relationship established by those agreements eventually deteriorated. To resolve their disputes, the parties entered into a written settlement agreement in 2013. The Almanac defendants breached the settlement agreement, once in 2014 and again in 2015. These breaches allowed the Almanac defendants to: "sabotage" VAT's "reasonable" attempts to have the Almanac defendants' interests in VAT's business bought out; "collect inflated interest payments" on debts; improperly conceal and destroy records of the business; and improperly break up the business and sell its assets at "fire-sale" prices. These breaches of the settlement agreement allowed the Almanac defendants to "plunder[]" the business and reduce VAT's "equity value" in the business from more than $130 million to zero.

¶7      With that broad set of allegations in mind, the operative complaint more specifically includes the following allegations against:  Almanac Realty Investors, LLC; Almanac Realty Securities V, LP; TWP FARS Corporation; TW-ARS Corporation; Matthew Kaplan; the executor of the estate of John McGurk; Justin Hakimian; and Randall Guenther.[2]  At all relevant times, VAT Master Corporation was the general partner of VAT Master Limited Partnership; the VAT corporation owned the VAT partnership, along with more than 200 additional

---

"parts of the record relied on."  Record citations are always required, whether or not parties also add parallel citations to the appendix pages that correspond to the record citations.

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] McGurk is deceased.  For ease of reference we refer to both the deceased person and to the estate that is a party to this action as "McGurk."

4

partners who consisted of VAT's investors.[3] The VAT partnership held an interest in a Wisconsin-based commercial real estate company.

¶8 VAT sought to expand. To raise money, on November 1, 2007, VAT "entered into a series of investment agreements" with the Almanac defendants, including Almanac, a Delaware limited liability corporation with a principal place of business in New York City and then called Five Arrows Realty Securities V., LP. In the "primary" agreement, Almanac extended a line of credit of up to $106.7 million, at 8.5% interest.

¶9 To facilitate these investments, a credit agreement and an operating agreement were entered into in 2007, which called for the following:

- VAT would create a new holding company named Vanta Commercial Properties, LLC ("Vanta").[4]

- The VAT partnership was to own 98 percent of Vanta, with Almanac owning the remaining two percent.

- The Vanta board would have four directors—two appointed by Almanac and two appointed by the VAT partnership—and "all material decisions" would require majority board approval. The result was that any major action would require a vote from at least one Almanac director or one VAT director.

¶10 Almanac appointed John McGurk and Matthew Kaplan to the Vanta board. The VAT partnership appointed Terrence Wall, then Vanta's chief executive officer, and another individual, who was then Vanta's chief operating officer.

---

[3] At times relevant to the litigation, VAT Master Corporation was known as T. Wall Properties Master Corporation and similarly VAT Master Limited Partnership was known as T. Wall Properties Master Limited Partnership. For ease of reference and following the parties, we use the more recent VAT designations.

[4] Vanta was once known as T. Wall Properties, LLC. For ease of reference and following the parties, we use the more recent Vanta designation.

¶11    In 2011, Vanta and Almanac "renegotiated the terms" of the 2007 credit and Vanta operating agreements.  Under the renegotiated 2011 agreements:

- "[T]he original line of credit was capped at the then outstanding balance of approximately $76.5 million—no longer $106.7 million—and a second new $25 million line of credit was opened at a 15% interest rate."

- The size of Vanta's board was increased from four to five, with Almanac to appoint three members and the VAT partnership to appoint two.

- All Vanta matters "were to be decided by a majority vote of the Board, except for modifications of any of the 'Transaction Documents'— including the 2011 Credit Agreement," which would require unanimous board approval.

- The VAT partnership was given 14 months "to attempt to raise capital to buy Almanac out," during which time Wall would remain as Vanta's chief executive officer.

¶12    Almanac appointed its employee Justin Hakimian as a Vanta director, joining Kaplan and McGurk on the Vanta board.  The VAT partnership appointed Terrence Wall and another individual.

¶13    In April 2012, the three Almanac directors voted to remove Terrence Wall both as chief operating officer and as board chair of Vanta and further voted to appoint McGurk as chief operating officer.

¶14    Disputes that arose among VAT, the Almanac defendants, and others included a breach of fiduciary duty lawsuit that was litigated in the Delaware Court of Chancery.  The parties sought to resolve their disputes, including the Delaware litigation, through a written settlement agreement that was executed in August and September 2013.  The settlement agreement is at the center of this appeal.  For background purposes it is sufficient to note the following regarding the settlement agreement.

¶15     Ten entities and four individuals entered into the settlement agreement. It obligated the parties to amend the Vanta operating agreement to cause the following changes to Vanta's governance: the board would be reduced from five members to three, with two appointed by Almanac and one by the VAT partnership; all board decisions would be made by majority vote of the three; but for transactions involving Almanac and the Almanac-related entity TWP-FARS, a unanimous vote would be required and all three board members would have to be present at a meeting for the board to take any action. There is no dispute by the parties now that the Vanta operating agreement was in fact amended, following execution of the settlement agreement, to establish the new governance rules addressing these quorum and unanimity requirements.

¶16     VAT's operative complaint in this Dane County action is based on the following premises: the settlement agreement itself required the parties to follow the new Vanta governance rules, and the Almanac defendants breached their standalone obligations to follow the governance rules that were created by the settlement agreement. The current action is not based on an alleged failure to amend the Vanta operating agreement as called for in the settlement agreement, nor is it based on alleged breach of the Vanta operating agreement. More specifically, additional allegations in VAT's operative complaint include the following:

- The settlement agreement "required that transactions involving Almanac necessitate a unanimous vote of all [Vanta] Board members" and that three members had to be present for the board to take any action.

- The defendants "knowingly and intentionally breached" the settlement agreement in August 2014 "by purporting to take action on behalf of the Company to liquidate the Company's assets with only the two Almanac Board members being present," not the required three.

- The defendants further breached the settlement agreement in September 2015 by attempting to pressure the VAT appointee to the board "into

approving the extension of [the defendants'] Credit Agreements" and then extending the loans through votes of "only two of three then-serving Directors' votes" at a special meeting of the board.

- These breaches of contract caused VAT "to incur substantial damages, including the payments of exorbitant and unnecessary interest to Almanac, the loss of Vanta's portfolio value, and ultimately, the loss to [VAT of its] investments" in Vanta.

¶17 To clarify, while the operative complaint uses words such as "scheme" and "conspiracy" as characterizations and to state factual allegations, it purports to state two causes of action, both against all of the Almanac defendants and both breaches of a contract, namely, the 2013 settlement agreement. VAT's decision to limit the operative complaint to contract breaches appears to be the result of an injunction entered by the Delaware Court of Chancery.[5] The Delaware court enjoined VAT from pursuing claims that include breach of the Vanta operating agreement, breach of fiduciary duty, fraud, and civil conspiracy, which were included in an earlier version of VAT's complaint in this Dane County litigation. It appears that under the Delaware injunction the only claims from VAT's original complaint that it could pursue in Dane County are claims for breaches of the settlement agreement.

*Motion To Dismiss and Circuit Court Rulings*

¶18 The Almanac defendants moved to dismiss the operative complaint against all defendants. The circuit court ruled that it states claims for breaches of the settlement agreement against Almanac Realty Securities V, LP, TWP-FARS

---

[5] The settlement agreement states that it "shall be governed by the laws of Wisconsin" and that any related litigation is to be venued in Dane County Circuit Court. In contrast, the Vanta operating agreement has a Delaware forum selection clause.

Corp., TW-ARS Corp., McGurk, and Hakimian. The Almanac defendants now appeal this ruling and we affirm for reasons explained below.

¶19 Separately, the Almanac defendants argued in the circuit court that the claims against McGurk and Hakimian in particular must be dismissed. The court denied the motion. The Almanac defendants now appeal this ruling and we affirm.

¶20 In addition, the Almanac defendants argued in the circuit court that the operative complaint fails to state claims upon which relief may be granted against Guenther, Almanac Realty Investors, LLC ("ARI"), and Kaplan. The court dismissed the action against Guenther and Kaplan as individuals, but withheld ruling on the motion to dismiss ARI.[6] VAT cross-appeals these rulings and we affirm.

---

[6] We do not address the Almanac defendants' motion to dismiss ARI or any issue related to a proposed second amended complaint that VAT seeks leave to file in a motion that remains pending in the circuit court. *See State ex rel. Wolf v. Town of Lisbon*, 75 Wis. 2d 152, 155-56, 248 N.W.2d 450 (1977) (appellate review is limited to the pertinent record before the circuit court).

Explaining further, before the circuit court issued the decision at issue in this interlocutory appeal and cross appeal VAT asked the court for leave to file a second amended complaint to replace what we refer to as the operative complaint. VAT's position was that it deserved an opportunity to attempt to allege that ARI, which is not a party to the settlement agreement, is liable under one particular theory of liability: allegedly exercising control over other corporate defendants in a manner that triggers liability under the alter-ego theory for piercing the corporate veil. The court stated in its now-challenged decision that it would allow VAT to amend the operative complaint in the interest of justice, given that the Almanac defendants did not object or otherwise address these particular theories of liability for ARI and also considering the procedural posture of the case. *See* WIS. STAT. § 802.09. Approximately one month later, VAT filed a proposed second amended complaint and a motion for leave to file it, making additional claims and allegations regarding ARI, Kaplan, Guenther, and McGurk. The circuit court has not acted on the motion. Today's opinion is limited to resolving the challenges to the rulings the circuit court made that were based on the operative complaint, without reference to the proposed second amended complaint.

Separately, in a ruling not challenged in the appeal or the cross appeal, the circuit court also directed VAT to amend the operative complaint to remove references to a "knowing and intentional breach of contract" as a cause of action.

## DISCUSSION

### I.      Legal Standards

¶21     The parties do not dispute the following well-settled legal rules.

¶22     The motion at issue in this appeal is one to dismiss for failure to state a claim, which is a challenge to the legal sufficiency of the complaint. ***Data Key Partners v. Permira Advisers LLC***, 2014 WI 86, ¶19, 356 Wis. 2d 665, 849 N.W.2d 693; WIS. STAT. § 802.02(1)(a).  Courts "accept as true all facts well-pleaded in the complaint and the reasonable inferences" arising from those facts, but courts "cannot add facts in the process of construing a complaint." ***Data Key***, 356 Wis. 2d 665, ¶19.  Whether a complaint states a claim upon which relief can be granted is an issue of law that is subject to de novo review on appeal. ***Id.***, ¶17.

¶23     The issues in this appeal and cross appeal all involve the interpretation of the settlement agreement, a written contract.  Therefore, the contract analysis is based on canons of contract interpretation. *See **Tufail v. Midwest Hospitality, LLC***, 2013 WI 62, ¶24, 348 Wis. 2d 631, 833 N.W.2d 586 (applying the canons of contract interpretation to a lease because the lease is a written contract).

¶24     "The elements of [a] breach of contract claim are (1) the existence of a contract between the plaintiff and the defendant; (2) breach of that contract; and (3) damages." ***Pagoudis v. Keidl***, 2023 WI 27, ¶12, 406 Wis. 2d 542, 988 N.W.2d 606.  The dispute here is whether the Almanac defendants could have breached the settlement agreement by allegedly violating the new quorum and unanimity governance rules referred to in the settlement agreement.

¶25     The following contract law canons are relevant here:

10

> Contract interpretation generally seeks to give effect to the parties' intentions. However, "subjective intent is not the be-all and end-all." Rather, "unambiguous contract language controls contract interpretation."
>
> Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms. "We presume the parties' intent is evidenced by the words they chose, if those words are unambiguous."
>
> If the terms of the contract are ambiguous, evidence extrinsic to the contract itself may be used to determine the parties' intent. "A contract provision is ambiguous if it is fairly susceptible of more than one construction."
>
> Contract language is construed according to its plain or ordinary meaning, consistent with "what a reasonable person would understand the words to mean under the circumstances." For a business contract, that is "the manner that it would be understood by persons in the business to which the contract relates."

*Tufail*, 348 Wis. 2d 631, ¶¶25-28 (quoted sources omitted).

¶26 Contract interpretation generally presents issues of law that we review de novo without deference to circuit court conclusions. *Briggs & Stratton Power Prod. Grp., LLC v. Generac Power Sys., Inc.*, 2011 WI App 36, ¶4, 332 Wis. 2d 160, 796 N.W.2d 234. This includes review of the specific issue as to whether the terms of a written contract are ambiguous. *Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 2000 WI 26, ¶24, 233 Wis. 2d 314, 607 N.W.2d 276; *Brown v. Maxey*, 124 Wis. 2d 426, 442, 369 N.W.2d 677 (1985) ("'[w]hether ambiguity exists in a contract is a question of law'" (quoted source omitted)). However, once it is determined as a matter of law that a provision is ambiguous, interpretation of that provision then becomes an issue of "contract interpretation for the jury." *See Management Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 177-78, 557 N.W.2d 67 (1996); *Jones v. Jenkins*, 88 Wis. 2d 712, 722, 277

N.W.2d 815 (1979) (when a contract is ambiguous, requiring reliance on extrinsic evidence, "the question is one of fact").[7]

## II. The Settlement Agreement is Ambiguous Regarding the Obligations of the Parties

¶27 The Almanac defendants moved to dismiss VAT's operative complaint against all of them, arguing in pertinent part that the complaint rests on the false premise that the new Vanta governance rules are independently enforceable through the settlement agreement. In response, VAT argued that this premise is not false and that the settlement agreement is an independently enforceable agreement requiring the parties to follow the new governance rules that the Vanta board "could not act without [the presence of] VAT's representative" on the board and "could not approve transactions with Almanac without the affirmative vote of all members." In other words, the dispute between the parties is whether the settlement agreement creates a standalone contractual basis to enforce the new governance rules, as VAT argues, or instead the parties agreed in the settlement agreement to effectuate the new governance rules exclusively by amending the Vanta operating agreement, as the Almanac defendants argue.

---

[7] Read in isolation, some shorthand references in Wisconsin case law suggest that it is for the courts to resolve contract ambiguity in enforceable contracts when extrinsic evidence is properly under consideration. *See, e.g.*, ***Patti v. Western Mach. Co.***, 72 Wis. 2d 348, 351, 241 N.W.2d 158 (1976) (stating that, if a contract is determined by a court to be ambiguous, "then the court is not restricted to the face of the instrument in ascertaining intent, but may consider extrinsic evidence"). But the authority we cite in the text addresses the issue directly and establishes that it is for the jury or other trier of fact to interpret ambiguous terms "in light of the apparent purpose of the contract as a whole, the rules of contract construction, and relevant extrinsic evidence of the parties' intent and the meaning of the words that they used." *See* 11 WILLISTON ON CONTRACTS § 30:7 (4th ed. May 2023 update) (citing authority that includes ***Management Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.***, 206 Wis. 2d 158, 557 N.W.2d 67 (1996)). Consistent with this rule, it is only when no extrinsic evidence is available, or if the extrinsic evidence bearing on the interpretation leads to just one reasonable interpretation, that the meaning of an ambiguous contract becomes an issue of law to be resolved by a court. *See **id.***

¶28 In ruling that the operative complaint states claims for breach of the settlement agreement against defendants Almanac Realty Securities V, LP, TWP-FARS Corp., TW-ARS Corp., McGurk, and Hakimian, the circuit court intentionally did not consider evidence that is extrinsic to the four corners of the settlement agreement. Instead, the court agreed with VAT that the settlement agreement itself unambiguously requires that the parties follow the new Vanta governance rules.

**A. Additional Background**

¶29 The settlement agreement states that it is "a comprehensive resolution" of the Delaware litigation as well as "a series of other disputes, claims, and issues." It is divided into the following pertinent parts: an August 14, 2013 document entitled Settlement Agreement ("the initial part of the settlement agreement"); an amendment dated September 16, 2013 ("the September 2013 amendment to the settlement agreement"); and exhibits to the amendment, most notably an unexecuted document called "First Amendment to Amended and Restated Limited Liability Company Agreement of T. Wall Properties, L.L.C." ("the form Vanta operating agreement amendment").

¶30 Section 1 of the initial part of the settlement agreement consists of two paragraphs. VAT does not claim that the Almanac defendants breached any provision in the first paragraph, but the following portion of the first paragraph provides context:

> Effective upon the date of execution of this Agreement by all parties, [Wall] and Kaplan shall be deemed to have resigned from the [Vanta board] and the [Vanta board] shall thereafter be comprised of three (3) members, who shall be McGurk, Hakimian[,] and a third member appointed by [the VAT partnership] promptly after the execution of this Agreement[, but Wall shall not be the third appointee].

The second paragraph of Section 1 addresses Vanta governing procedures that VAT claims were breached by the Almanac defendants.  It states in full:

> The parties also agree that the [Vanta] Operating Agreement shall be amended to reduce the size of the [Vanta] Board from five (5) members to three (3) members[,] with two (2) members appointed by Almanac and one (1) member appointed by [the VAT partnership] and thereafter all Board decisions shall be made by majority vote of the three (3) Board members[,] either at a regular meeting or a special meeting of the Board or by a written consent resolution signed by all three members of the Board; provided, however, that the parties acknowledge that the 80% supermajority Board member vote required for transactions with Almanac and TWP-FARS by Section 2.1 of the Amended and Restated Supplemental Rights Agreement shall be construed to require a unanimous vote of all Board members with a 3[-]person Board.  Except as otherwise provided in this Section, all three Board members shall be present at a meeting in order for the Board to take any action, although a vote by two members of the Board will constitute legal action of the Board and shall be binding upon [Vanta] even if the third member of the Board abstains from the vote. If only two Board members appear at two consecutive regular or special Board meetings properly called in accordance with the [Vanta] Operating Agreement, then such two Board members shall constitute a quorum at the next regular or special meeting called thereafter and a vote by such two members shall constitute legal action by the Board.

The specific quorum and unanimity requirements for Vanta governance reflected in the second paragraph of Section 1 are the only types of changes in Vanta governance rules that are at issue in this appeal.

¶31    Under Section 11 of the initial part of the settlement agreement, "[t]he various transactions and other elements of this Agreement shall be closed in two steps[,] with the first closing to occur" at a designated law office "as soon as possible after execution of this Agreement."  At the first closing, the Vanta operating agreement "will be amended in accordance with the provisions of Section 1 of this

Agreement to reduce the size of the Board from five (5) members to three (3) members," and this amendment "shall be executed by all parties to the present" Vanta operating agreement.

¶32    The September 2013 amendment to the settlement agreement provides in pertinent part that the following document would have to be created for the first closing: a fully executed version of the form Vanta operating agreement amendment. This is the agreed-upon form of that amendment, providing for the governing structure for the Vanta board described in the second paragraph of Section 1. In particular, the September 2013 amendment to the settlement agreement states that "as required by" and "in satisfaction of" a particular provision of the settlement agreement—namely its Section 11(a)(2), which obligates the parties to change Vanta's operating agreement "in accordance with" the new Vanta governance rules described in the settlement agreement—"the parties to the [Vanta] Operating Agreement shall deliver executed originals of" the form Vanta operating agreement amendment at the first closing.

**B. Analysis**

¶33    The Almanac defendants do not dispute for purposes of this appeal that the settlement agreement is a contract, that it binds them (putting aside the argument addressed below regarding McGurk and Hakimian as individuals), and that the operative complaint alleges that they violated the newly adopted Vanta governance rule changes in 2014 and 2015.[8] Instead, they argue that the settlement

---

[8] The Almanac defendants do not suggest, for example, that the settlement agreement is unenforceable because it is "indefinite," as that term is used in contract law. *See* **Management Comput. Servs.**, 206 Wis. 2d at 178 (explaining that indefiniteness, or vagueness, concerning a material term prevents the creation of an enforceable contract—in contrast to ambiguity in a material contract term, which may be resolved through the consideration of extrinsic evidence).

agreement cannot reasonably be interpreted to impose obligations—independent of those contained in the operating agreement—requiring the parties to follow the new Vanta governance rules, because the settlement agreement was exclusively an agreement to amend the Vanta operating agreement. Therefore, the argument proceeds, because the Vanta operating agreement was in fact amended, the Almanac defendants could not have liability for breaching the settlement agreement based on alleged failure to follow the new Vanta governance rules. In making this argument, the Almanac defendants emphasize settlement agreement terms that establish the obligation of the parties to amend the Vanta operating agreement and also emphasize that the changes in governance rules identified in the settlement agreement match the changes in governance rules contained in the September 2013 amendment to the settlement agreement.

¶34 VAT does not dispute that the parties agreed in the settlement agreement to execute the form Vanta operating agreement amendment that bound the parties to follow the new governance rules. Instead, VAT argues that there is no reasonable interpretation of the settlement agreement under which the parties were not also obligated *by the settlement agreement itself* to abide by the new Vanta governance rules. In other words, the requirement to follow the governance rule changes described in the settlement agreement constitutes a standalone set of obligations. This is the basis on which VAT claims the Almanac defendants breached the settlement agreement in 2014 and 2015 by failing to follow the new Vanta governance rules.

¶35 We conclude that the settlement agreement is fairly susceptible to more than one reasonable interpretation on this disputed point and therefore proper construction of the agreement requires consideration of extrinsic evidence that has not been developed in the record to this point. Following remand, the circuit court

may consider submissions from the parties about potential relevant extrinsic evidence and determine proper next steps.

¶36 Turning to one side of the ambiguity issue, we conclude that the following is one reasonable interpretation of the settlement agreement. The first paragraph of Section 1 exclusively addresses the only two changes to governance of the Vanta board that were put into effect upon execution of the settlement agreement: (1) that Wall and Kaplan are deemed to have "resigned" from the Vanta board and that two identified individuals, and a third individual appointed by the VAT partnership, would now sit on the Vanta board; and (2) some details as to how these three individuals would be treated as board members. In contrast, this interpretation proceeds, the second paragraph of Section 1 is limited to an agreement that the Vanta operating agreement "shall be amended" to create the new Vanta governance rules described in the second paragraph. There is logic in placing these two separate sets of topics in different paragraphs, with the first paragraph commencing with the phrase, "Effective upon the date of execution of this Agreement by all parties," and the second paragraph commencing with the phrase, "The parties also agree that the [Vanta] Operating Agreement shall be amended."

¶37 As counsel for the Almanac defendants put it at oral argument on appeal, under this interpretation of the settlement agreement the only aspect of Vanta's governance that changed upon execution of the settlement agreement—and which creates an obligation beyond amending the operating agreement—was that "two Board members resigned," leaving a board of three, as required by the first paragraph of Section 1.

¶38 Turning to the other side of the ambiguity issue, we also conclude that the following is a different reasonable interpretation. While the first sentence of the

17

second paragraph of Section 1 includes the phrase "shall be amended" in reference to the Vanta operating agreement, the second paragraph goes on to speak in terms more consistent with an intent that the settlement agreement independently binds the parties to the new Vanta governance rules. Even within that first sentence, a possible shift in meaning is signaled through use of the phrase "*and thereafter* all Board decisions *shall be* made ...." (Emphasis added.) Then, after a semi-colon, it states, "provided, however," "the parties acknowledge" the unanimity requirement. Beyond that, in an entirely new sentence the quorum requirement appears, with no reference to the form Vanta operating agreement amendment.

¶39     In particular, VAT argues that the use of the semi-colon before the phrase "provided, however," is an unambiguous end point for all terms modified by the phrase "the [Vanta] Operating Agreement shall be amended to …." After that point, VAT contends, there is not only the declarative statement "the parties acknowledge," but what follows is mandatory or directory in nature ("shall be construed to require … shall be present at a meeting"), without making reference to amending the Vanta operating agreement. We do not agree with VAT that these signals go all the way to defeating ambiguity in VAT's favor. But we conclude that they contribute to ambiguity.

¶40     The Almanac defendants rely heavily on one reference to the amendment of the Vanta operating agreement to change the governance rules. The reference is that this is a task "required by" and "in satisfaction of" a particular provision of the settlement agreement, namely its Section 11(a)(2), which requires the parties to change Vanta's operating agreement "in accordance with" the new governance rules described in the settlement agreement. But there is a reasonable interpretation for this reference that undermines the Almanac defendants' interpretation. This could simply mean that the settlement agreement is not fully

satisfied unless such an amendment occurs—not that full satisfaction occurs upon amendment. That is, this does not necessarily mean that there could be no continuing governance obligations described in the settlement agreement beyond the requirement to amend the operating agreement, a requirement that VAT does not dispute.

¶41 Stepping back, there is another contextual point that favors the VAT position, although again without going all the way to showing a lack of ambiguity. There are numerous clues in the settlement agreement that it is intended as a detailed and sweeping "comprehensive resolution," as the agreement puts it, intended to directly take on and resolve corporate governance issues, including potential abuses of Vanta board positions. This context is consistent with an interpretation that the parties could have intended that the new governance rules be enforceable in two separate ways: through the settlement agreement and also through the amended Vanta operating agreement.

¶42 Two additional points support our conclusion of ambiguity.

¶43 First, in entering into the settlement agreement the parties may not have intended to create two different agreements covering overlapping topics regarding Vanta governance: the settlement agreement governed by Wisconsin law and the Vanta operating agreement governed by Delaware law. That is, there is at least potential tension in creating two agreements that, as the Almanac defendants now put it, "simultaneously and indefinitely govern the conduct of a Delaware limited liability company"—including potentially clashing integration clauses— creating the possibility of "tortuous interplay" between the two agreements. At the same time, however, the Almanac defendants do not persuade us that this potential-

19

conflict issue establishes an unambiguous meaning in favor of the Almanac defendants.

¶44     Explaining further, the appellate briefing by the Almanac defendants on this clashing-agreements concept is oblique.  They acknowledge that, under Delaware law, multiple documents can simultaneously govern the operation of a Delaware LLC, but they suggest that there is nonetheless a problem when those documents govern the same operational aspects subject to the potential for orders issued in two separate court jurisdictions.  At oral argument, we pressed the Almanac defendants through their counsel for details and we received no answer that establishes an inevitable conflict or obvious absurdity arising from the possibility of two governing documents addressing overlapping obligations—as opposed to the mere hypothetical potential for governance confusion or litigation. *Cf. **Chapman v. B.C. Ziegler & Co.***, 2013 WI App 127, ¶¶2, 11, 351 Wis. 2d 123, 839 N.W.2d 425 (rejecting one proposed interpretation of a contract as absurd).

¶45     Separately, the Almanac defendants assert that an interpretation that would have the parties creating a tandem set of obligations "lacks any precedent." But of course VAT is not obligated to cite a court opinion reflecting a contract entered into by parties in another case that was worded and structured the same way as the settlement agreement here.  We are guided instead by the contract law canons summarized above as applied to the language and structure of the settlement agreement.

¶46     Second, the first paragraph of Section 1 simply states, without making reference to the form Vanta operating agreement amendment, that Wall and Kaplan are deemed to have resigned from the Vanta board and the board "shall thereafter be comprised of three (3) members," identifying the names or the method of

appointment for each of the three members. Do these provisions in themselves establish, as the circuit court appeared to conclude, that the execution of the settlement agreement caused the number of board members to change from five to three? There is support for this view in the first paragraph, which states that the Vanta board "shall thereafter be comprised of three (3) members." Or, instead, was this merely a setup intended to provide context for establishing who the three board appointees "shall be" under the new governance rules established through amendment of the Vanta operating agreement pursuant to the second paragraph? There is potential support for this view in the more formal statement in the second paragraph that the Vanta operating agreement "shall be amended to reduce the size of the [Vanta] Board from five (5) members to three (3)." The lack of a clear answer adds to ambiguity about what the parties intended to accomplish in Section 1 and therefore in the settlement agreement as a whole.

¶47 The Almanac defendants at times suggest reliance on a categorical argument that we reject. They argue that, because the settlement agreement includes an agreement to amend the Vanta operating agreement to incorporate the new governance rules, then the settlement agreement could not also include a separate agreement that independently binds the parties to the new governance rules. But this categorical argument presents a false choice. At the level of logic and common sense, the parties here could intend to accomplish both goals in a single agreement and we conclude that one reasonable interpretation is that they did this. The Almanac defendants theorize that the parties to the settlement agreement could have specified that the agreement alone bound the parties to the new governance rules— without also agreeing to amend the Vanta operating agreement. But, assuming that this was a viable alternative, its potential tells us nothing about the meaning of the settlement agreement actually executed by the parties.

21

¶48 As part of this argument, the Almanac defendants suggest that the settlement agreement—when all of its parts are taken into account, including the form Vanta operating agreement amendment—is unambiguously a complete agreement that aims to accomplish adoption of the new Vanta governance rules in a single manner: amendment of the Vanta operating agreement. Again, this way of viewing the settlement agreement would be consistent with one reasonable interpretation. At the same time, however, the Almanac defendants cannot direct us to language in the settlement agreement that unambiguously conveys this idea, for example through the use of such phrases as "only through amendment" or "exclusively by amendment."

¶49 On a related point, the Almanac defendants ask us to place substantial weight on an opinion of our supreme court, *Baeten v. Kaukauna Dairy Co.*, 1 Wis. 2d 319, 84 N.W.2d 79 (1957), asserting that it is "controlling" here. According to the Almanac defendants, *Baeten* stands for the proposition that a contract containing an obligation to amend another document cannot also include a separate obligation that independently enforces the substance of the planned amendment. But for current purposes *Baeten* merely establishes a proposition that VAT does not dispute: parties *can* enter into a contract that obligates them to amend a separate document without at the same time intending that the contract constitutes an agreement to effectuate the substance of the planned amendment. *See id.* at 324 (interpreting a collective-bargaining agreement to mean that a company did not assume the obligation at issue but instead agreed only to amend a trust toward accomplishment of the same objective). We agree with VAT that the agreement under discussion in *Baeten*, which was apparently limited to requiring amendment, is readily distinguishable from the settlement agreement here and that *Baeten* does not stand for the categorical position taken by the Almanac defendants. *See id.*

¶50 Summing up on this issue, we would essentially have to rewrite the settlement agreement to render it unambiguous in favor of either side's current position. It will be for the circuit court following remand to determine appropriate next steps on this issue, based in part on litigation choices and options available to the parties going forward. This would presumably involve determining whether the parties are able to offer relevant extrinsic evidence and, if so, whether this evidence creates a genuine issue of material fact, in which case the issue must be resolved by the finder of fact. *See Management Comput. Servs.*, 206 Wis. 2d 158, 177-78.[9]

### III. McGurk and Hakimian Potential Liability

¶51 The Almanac defendants argued in the circuit court that the claims against McGurk and Hakimian in particular must be dismissed because each signed the settlement agreement solely in his capacity as a member of the Vanta board and not as an individual. Almanac also argued that if the claims against McGurk and

---

[9] We note for context the following explanation regarding how to resolve ambiguity in contracts:

> Admissible extrinsic evidence might include "the surrounding circumstances including factors occurring before and after the signing of an agreement." *Board of Regents of Univ. of Wis. Sys. v. Mussallem*, 94 Wis. 2d 657, 671, 289 N.W.2d 801 (1980); *see also Smith v. Osborn*, 66 Wis. 2d 264, 272, 223 N.W.2d 913 (1974) ("In determining the [meaning of ambiguous contract language], this court has held that it is proper to consider the conduct of the parties and the negotiations which took place, both before and after the execution of the documents, and to consider all related documents of the parties."); *Painter v. Estate of Grossman*, 250 Wis. 457, 461, 27 N.W.2d 365 (1947) ("'The intention of the parties to any particular transaction may be gathered from their acts and deeds, in connection with surrounding circumstances, as well as from their words ....'" (quoting *Tyler v. Burrington*, 39 Wis. 376, 379 (1876))).

*Kernz v. J.L. French Corp.*, 2003 WI App 140, ¶10, 266 Wis. 2d 124, 667 N.W.2d 751 (alteration in *Kernz*).

23

Hakimian exclusively amount to claims that they breached their duties as Vanta board members, any such claims could be brought only in a derivative action on behalf of Vanta.[10] VAT primarily responded that the complaint alleges that McGurk and Hakimian are proper parties to this action based on their personal signatures on the settlement agreement and because they are each alleged to have breached the settlement agreement that they signed.

¶52    The circuit court denied the motion to dismiss primarily on the ground that the operative complaint is based on contractual rights and obligations created by the settlement agreement, which was personally signed by McGurk and Hakimian. The Almanac defendants appeal this ruling.

### A.  Additional Background

¶53    The first page of the initial part of the settlement agreement lists the parties, including John McGurk and Justin Hakimian, without referring to them as representatives of any other individual or any entity. The initial part of the settlement agreement reintroduces the parties and creates shorthand references for them. The reintroduction list includes John McGurk and Justin Hakimian, as well as Kaplan, "as members of the Board of Managers of [Vanta] and individually referred to as 'McGurk,' 'Kaplan,' and 'Hakimian' and collectively referred to as the 'Almanac Directors.'"

---

[10] "[I]ndividual shareholders cannot directly sue a corporation's directors or officers when the 'primary injury' resulting from the actor's wrong is to the corporation itself," but "[i]nstead, a shareholder who wishes to seek redress for an injury 'primarily' to the corporation must bring a derivative action on behalf of the corporation." *Marx v. Morris*, 2019 WI 34, ¶37, 386 Wis. 2d 122, 925 N.W.2d 112 (quoted authority omitted). There is no dispute that the operative complaint here is not a derivative action.

¶54    The signature section of the initial part of the settlement agreement is confusing in some respects. But the following features are most pertinent. McGurk and Hakimian each signed on behalf of an entity and also, separately, each signed at a location that has no obvious indication that the signer represents another person or entity. In the places where the signature lines for McGurk and Hakimian are not accompanied by a term such as "by" or "through" in reference to another person or entity there is also not a variation on the words "individual" or "personal." This contrasts with one of the signature locations for Wall, which explicitly clarified that he signed "Individually," in addition to separately signing on behalf of other entities in specified roles.

¶55    One exhibit attached to the amendment to the settlement agreement is a consent-and-release form for investors in one related entity, which characterizes the settlement agreement as being among parties who included: "John McGurk, Matthew Kaplan, and Justin Hakimian," without suggesting that either McGurk or Hakimian signed in a representative capacity—there is no "by" or "through" signal next to their names.

**B. Analysis**

¶56    We agree with the circuit court that the only reasonable interpretation of the settlement agreement is that McGurk and Hakimian are parties to it, each signing in an individual capacity, and that the operative complaint states claims for breaches of the contractual duties that McGurk and Hakimian individually owe to the VAT plaintiffs. As the circuit court put it:

> By signing the agreement as parties, McGurk and Hakimian agreed to be bound by its provisions and potentially liable to the other parties for any material breach of the agreement. Their status as Vanta board members does not shield them from liability under the Settlement Agreement.

We agree that this is the only viable interpretation, given all pertinent terms when considered in context as the terms are reasonably understood. *See Tufail*, 348 Wis. 2d 631, ¶¶25-28.

¶57  The Almanac defendants emphasize that the settlement agreement singles out Terrence Wall's personal signature block for the specific label "Terrence R. Wall, individually," and in contrast the word "individually" does not appear next to McGurk's and Hakimian's names. On its face, this could suggest that personal liability in the settlement agreement is always flagged by the phrase "individually." But there is a significant contextual point that undermines this suggestion. *See MS Real Est. Holdings, LLC v. Donald P. Fox Fam. Tr.*, 2015 WI 49, ¶38, 362 Wis. 2d 258, 864 N.W.2d 83 (the meaning of particular provisions in a contract are ascertained by reference to the contract as a whole). The name "Wall" occupies a place of notable prominence in the settlement agreement: "Wall" appears as part of the names of eight of the ten signature blocks for entities represented as signatories and "Wall" appears 132 times in the settlement agreement. In contrast, McGurk's and Hakimian's names appear 11 and 10 times respectively and never in the names of an entity. Thus, the risk of confusion about the capacity in which Wall signed is amplified by the frequency of "Wall" references, especially as it appears in entity names, providing a clear explanation for the insertion of "individually" for Wall alone when he signed as an individual.

¶58  Otherwise, the signals cited by the parties either do not clearly point in a specific direction or else point in favor of personal capacity. For example, we disagree with the Almanac defendants that the settlement agreement "clearly and expressly define[s] McGurk and Hakimian as parties solely in their capacities as Members of the Vanta Board." It identifies them, accurately, as board members, but at the same time in multiple ways it signals that each is signing at one place in

a representative capacity and at another in a personal capacity. Further, the Almanac defendants fail to provide an explanation as to why, if McGurk and Hakimian were not signing in their individual capacities, they signed at locations at the bottom of the signature section, after all other signatures and without additional designation, including the places at which they had signed as officers of named entities.

¶59 The Almanac defendants argue that the circuit court's conclusion that the operative complaint does not state a derivative claim "is beside the point" because the sole claim that VAT could make against McGurk and Hakimian concerning "the votes they took in their capacities as members of the Vanta Board" would be in the form of a derivative action on behalf of Vanta. The Almanac defendants argue that such a claim could not be made against them in this breach of contract action. But the Almanac defendants fail to support this argument, which appears to be inextricably intertwined with their arguments that McGurk and Hakimian are not parties to the settlement agreement in their individual capacities.

¶60 The Almanac defendants assert that "no provision in the Settlement Agreement affects the personal rights or obligations of McGurk or Hakimian." But this is a circular argument, true only if one assumes all in favor of the Almanac defendants. Under what we conclude is the only reasonable interpretation of the settlement agreement as a whole, McGurk and Hakimian personally assumed the rights and obligations stated in the settlement agreement.

¶61 In sum, "'what a reasonable person would understand the words" of the settlement agreement "to mean under the circumstances,'" *Tufail*, 348 Wis. 2d 631, ¶28 (quoted source omitted), is that the parties created an agreement to which McGurk and Hakimian bound themselves in their individual capacities, assuming contractual duties that they assumed as individuals.

27

### IV.     Guenther and Kaplan Potential Liability

¶62     The circuit court dismissed both Guenther and Kaplan from this action.  VAT cross-appeals those rulings.  We address the two defendants in turn, explaining why we affirm both rulings.

*Guenther*

¶63     The Almanac defendants point out that Guenther is not a party to the settlement agreement.  Based on this fact, they argue that he could not have liability for breaches of contract, which are the only claims in the operative complaint, arising from alleged breaches by other persons and entities.  VAT acknowledges that the theory of the operative complaint is that Guenther is a proper party because he allegedly "actively participated in the conspiracy to breach the Settlement Agreement"—that is, joined in a civil conspiracy to breach a contract to which he was not a party.  The circuit court granted the motion to dismiss Guenther on the grounds that there is no claim recognized in Wisconsin law based on the proposition "that third parties who conspire to breach a contract can be held liable *in contract*." (Emphasis in original.)  In its cross appeal, VAT presents only the following as its theory of liability for Guenther based on the operative complaint and, in its initial cross-appeal brief, points to this single theory as its sole basis for reversing the circuit court:  Guenther could be liable under *contract* law for conspiring with others to breach a contract to which he is not a party.  We now explain why we reject that narrow, breach-based argument and conclude that VAT's other points in its cross-reply brief come too late.

¶64     VAT's narrow argument appears to have two closely related aspects. One involves tort law (as opposed to contract law) and the other involves the concept of a civil conspiracy.

¶65     Authority that VAT cites is inapposite in large part because it is based on tort law, not contract law, and the only claims in the operative complaint are based on contract law.  In Wisconsin, tortious inducement of breach of contract is committed by the person "'who intentionally and improperly interferes with the performance of a contract … by inducing or otherwise causing the third person not to perform the contract.'"  *See Magnum Radio, Inc. v. Brieske*, 217 Wis. 2d 130, 136, 577 N.W.2d 377 (Ct. App. 1998) (quoting RESTATEMENT (SECOND) OF TORTS § 766 (Am. L. Inst. 1979)); *see also St. Francis S & L Ass'n v. Hearthside Homes, Inc.*, 65 Wis. 2d 74, 81, 221 N.W.2d 840 (1974) (referring to liability for "the tortious intermeddler").   Thus, for example, VAT relies heavily on selected language in *Mendelson v. Blatz Brewing Co.*, 9 Wis. 2d 487, 101 N.W.2d 805 (1960), without coming to grips with the fact that the underlying cause of action in *Mendelson* involved tortious inducement of breach of contract.  *See id.* at 490-91 (citing RESTATEMENT OF TORTS § 766 (Am. L. Inst. 1934)).

¶66     What could remain of VAT's argument is based on the proposition that VAT can save its tort-based claim in this contract action by labeling it as a civil conspiracy action.[11]  The notion that there is an independent civil conspiracy cause of action in Wisconsin that is not based on an identified civil wrong has been rejected by our supreme court.  *See Modern Materials, Inc. v. Advanced Tooling Specialists, Inc.*, 206 Wis. 2d 435, 448, 557 N.W.2d 835 (Ct. App. 1996); *Onderdonk v. Lamb*, 79 Wis. 2d 241, 246, 255 N.W.2d 507 (1977) ("The gravamen of a civil action for damages resulting from an alleged conspiracy is … not the conspiracy itself but rather the civil wrong which has been committed pursuant to

---

[11]  To repeat, the only causes of action in the operative complaint are breaches of contract, even though the complaint employs characterizations and makes factual allegations using such words as "conspiracy" and "scheme."

29

the conspiracy and which results in damage to the plaintiff."). The conduct alleged by VAT to be the civil wrong that is the object of the conspiracy amounts to tortious inducement of breach of contract, which is a tort. In other words, there is a fatal mismatch between the only causes of action stated against Guenther (breach of contract) and the nature of the allegations against him (tortious inducement).

¶67    VAT rests heavily on the statement of our supreme court in *Mendelson* that "[a] conspiracy to cause a breach of contract is actionable." *See Mendelson*, 9 Wis. 2d at 490. But the *Mendelson* court proceeded to explain what it meant and the meaning does not help VAT. What was actionable in that case was a claim for civil conspiracy based on an alleged tort—specifically in that case, "wrongful interference by a third party with an employment relationship terminable at will." *Id.* Summing up, then, an alleged violation of the duty under tort law not to interfere with the contractual rights of others can be the subject of a civil conspiracy claim in Wisconsin, but that is not what is alleged in the operative complaint here.

¶68    As the Almanac defendants point out, the authority that VAT relies on identifying viable civil conspiracy claims involves tortious civil wrongs and therefore does not support VAT's argument that it can state a contract law-based claim for conspiracy to breach a contract. *See, e.g.*, *Schwenn v. Schwenn*, 166 Wis. 420, 166 N.W. 171 (1918) (addressing alleged conspiracy to "fraudulently" induce breach of contract); *Martens v. Reilly*, 109 Wis. 464, 473, 84 N.W. 840 (1901) (addressing alleged conspiracy to "willful[ly] intermeddl[e]" in a right of first refusal in purchase of leased land). It is the same with VAT's citations to case law from other jurisdictions. Even if those opinions could provide illumination here,

the plaintiffs in those cases also relied on torts as the alleged civil wrongs to provide the basis for civil conspiracy claims.[12]

*Kaplan*

¶69     The Almanac defendants argue that Kaplan, although he signed the settlement agreement, could not have breached it based on the allegations in the operative complaint because Kaplan resigned from the Vanta board well before the 2014 and 2015 votes that VAT alleges constituted breaches of the settlement agreement.  VAT argues that he is a proper party because the operative complaint alleges that he "participated in the conspiracy to breach" the settlement agreement, including "actively work[ing] with Guenther to take control of Vanta."  The circuit court ruled that the operative complaint fails to allege specific facts showing that he breached the settlement agreement.

¶70     We conclude that the operative complaint does not state a claim that Kaplan personally breached the settlement agreement in connection with the Vanta board actions in 2014 and 2015 that VAT challenges.  The operative complaint contains no factual allegations, or reasonable inferences arising from the allegations, that could support this theory.  Putting aside merely conclusory assertions and characterizations, the complaint simply fails to describe conduct by Kaplan related to the alleged 2014 and 2015 breaches.  VAT argues that the operative complaint alleges facts that make out a claim that Kaplan "continued to participate in the

---

[12] For the first time in its cross-reply brief, VAT offers alternative arguments to the effect that it does not matter if the claim against Guenther is based on tort or contract law and that VAT is free to bring a tort action against Guenther in this case. This completely diverges from VAT's briefing in its opening cross-appeal brief, and it would be unfair to the cross-respondents for us to address this new theory now. *See A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 492, 588 N.W.2d 285 (Ct. App. 1998) (stating that it is "inherently unfair" for an appellant to save an argument for its reply brief because this deprives the respondent of an opportunity to address the argument in its brief).

conspiracy after he had left the Board" and was "an active part of the conspiracy that ran up through November 2017," but this is based on mere conclusory assertions in the operative complaint. Our conclusion is not, as VAT argues, a "quibble about the facts surrounding" Kaplan's involvement in breaches of contract and therefore a dispute to be decided by a jury. Instead, the operative complaint categorically fails to state a viable claim against Kaplan.[13]

## CONCLUSION

¶71 For these reasons, we affirm each of the rulings of the circuit court challenged in the appeal and in the cross appeal.

¶72 No costs to either party.

*By the Court*.—Order affirmed.

Not recommended for publication in the official reports.

---

[13] In an attempt to save the Kaplan claim, VAT directs us to allegations in the second amended complaint that VAT has moved the circuit court to allow it to file, in a motion that is still pending. But as discussed in note 6, *supra*, the second amended complaint was not before the circuit court when it made the decisions challenged in this appeal and cross appeal and therefore we ignore the content of the second amended complaint.